**Ethel M. NORRIS, an infant who sues by Granville M. Norris, her father and next friend, et al., Plaintiffs,**

v.

**STATE COUNCIL OF HIGHER EDUCATION FOR VIRGINIA et al., Defendants.**

**Civ. A. No. 365–70–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

May 12, 1971.

S. W. Tucker, Henry L. Marsh, III, Seymour Dubow, James W. Benton, Jr., Hill, Tucker & Marsh, Richmond, Va., Jack Greenberg, James M. Nabrit, III, Norman Chachkin, New York City, for plaintiffs.

Andrew P. Miller, Atty. Gen. of Virginia, William G. Broaddus, D. Patrick Lacy, Jr., Asst. Attys. Gen., Richmond, Va., for A. Linwood Holton, Governor of Virginia, and the State Council of Higher Education for Virginia.

R. D. McIlwaine, III, Petersburg, Va., for The Board of Visitors of the College of William and Mary in Virginia, and James M. Carson, President of Richard Bland College.

Edward S. Hirschler, Everette G. Allen, Jr., Hirschler & Fleischer, Richmond, Va., for The Board of Visitors of Virginia State College.

Philip J. Hirschkop, Alexandria, Va., Richard E. Crouch, Arlington, Va., for amicus curiae, American Civil Liberties Union of Virginia.

Before BUTZNER, Circuit Judge, and HOFFMAN and MERHIGE, District Judges.

BUTZNER, Circuit Judge:

The plaintiffs, black faculty members and students of Virginia State College and black high school students, complain that Virginia is still operating a racially identifiable dual system of higher education and that escalation of predominantly white Richard Bland College from a two-year institution to a four-year college will frustrate the efforts of its neighbor, predominantly black Virginia State College, to desegregate. They seek to enjoin the escalation of Bland, to require its ultimate merger with Virginia State and to require state officials to prepare a plan for the desegregation of every state supported college and university in Virginia. Named as defendants are the Governor of Virginia, the State Council of Higher Education, the Board of Visitors of the College of William and Mary, the President of Richard Bland College, and the Board of Visitors of Virginia State College.

Because the suit challenges the constitutionality of the Appropriations Act of 1970, ch. 461, Item 600, p. 754 (Acts of Assembly 1970), which provides for the escalation of Bland,[1] the Attorney General of Virginia representing the Governor and the Council, moved for a three-judge court pursuant to 28 U.S.C. § 2281. His motion was granted, and the plaintiffs' subsequent motion to dissolve the court is denied. Alabama State Teachers Ass'n v. Alabama Public School and College Auth., 289 F.Supp. 784 (M.D.Ala. 1968), aff'd mem., 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969).

---

1. Item 600 provides:
"Richard Bland College, at Petersburg
\*       \*       \*       \*       \*

"Operating expenses of educational and general activities including escalation to third- and fourth-year status...........
...................$420,625   $558,305."

■ We hold that the provisions of Item 600 for Bland's escalation violate the 14th amendment because they serve to perpetuate a state supported racially identifiable dual system of higher education. Consequently, the Board of Visitors of the College of William and Mary and the President of Richard Bland College will be enjoined from escalating Bland. We deny the other relief which the plaintiffs seek.

Prior to Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), Virginia's constitution and statutes required all state supported institutions of higher learning to be racially segregated. The state operated two Negro undergraduate colleges, Norfolk State and Virginia State, and it appropriated funds for black graduate students to study in other states. White undergraduate and graduate students were eligible to attend the state's other colleges and universities.

Since *Brown,* the state has permitted all students to apply to the college of their choice. Nevertheless a racially identifiable dual system of higher education exists in Virginia today. Black students comprise approximately 12% of the enrollment in the state's 15 four-year colleges and graduate schools, yet 81% of them are concentrated in the two colleges which formerly were segregated by law. At the other end of the spectrum, only Virginia Commonwealth University has a black enrollment as high as 7%, and in ten of the fifteen colleges and universities black students constitute less than 2% of the enrollment. The state also operates three two-year branches of other institutions. Of these, only one has a black enrollment of more than 8%. On the other hand, many of the sixteen community colleges created under the Virginia Community College Act of 1966, Va. Code Ann. §§ 23–214 through 231 (Repl. Vol.1969, have substantial black enrollments.

The College of William and Mary is the state's oldest educational institution. Fifty-one of its 3,750 graduate and undergraduate students are black. With the exception of one black graduate student who has a part-time administrative position, all of its faculty and administrative staff are white. The members of its Board of Visitors are white.

Bland was established in 1960 as a two-year branch of the College of William and Mary. In the exercise of its stewardship over Bland, William and Mary controls the expenditure of appropriations, makes rules and regulations, and is responsible for the selection of faculty and administrative staff. Va. Code Ann. § 23–49.1 (Repl. Vol. 1969). In the current academic year, 14 of Bland's 841 students are black. It has never had a black faculty member. Not until last year did its catalogue mention that it was open to all students regardless of race, and only recently has it attempted to recruit applicants from predominantly black high schools and to employ black faculty.

Virginia State College, established in 1882, was segregated by law until *Brown* was decided in 1954. From 1954 to 1964, although segregation in education had been legally abolished, the college accepted no white undergraduates and employed no white faculty members. In 1964, control of Virginia State was transferred from the State Board of Education to an integrated board of visitors. Since then, Virginia State has actively pursued a policy of recruiting white students and faculty. Its admissions officers have found it difficult to attract white students to a college which until very recently was black, and its enrollment of 2,524 includes only 70 white students. But even so, the number of its minority students compares favorably with other four-year colleges in the state. The college has been more successful in obtaining white faculty, hiring 43 white teachers since 1964.

Virginia State and Bland are located near Petersburg, Virginia, only about seven miles apart. Both colleges compete for students from nearby communities, although all students at Bland commute and the majority at Virginia State

do not. The President of Virginia State, who, with its Board of Visitors, opposes escalation of Bland, testified:

"[I]f Richard Bland is escalated to four years \* \* \* it would have a tremendously disastrous effect upon Virginia State's ability to attract and to hold white students from this particular area. Richard Bland represents, and I am afraid will continue to represent, the white institution to which whites go \* \* \*. In addition it seems to me that the escalation of Richard Bland could do nothing more than duplicate what is already being offered at Virginia State College."

Despite some testimony from William and Mary witnesses that white students would continue to enroll at Virginia State, we find that escalation of Bland would hamper Virginia State's efforts to desegregate its student body. The realities of the situation support this finding: the colleges are located close to each other; as four-year colleges they would offer substantially the same curricula; if Bland were escalated, white students would be more likely to seek their degrees at predominantly white Bland than at predominantly black Virginia State; and the part Bland now plays in sending some white students to Virginia State for their last two years would substantially decrease.

■ The President of Virginia State is not alone in his opposition to escalating Bland. The Virginia Commission on Higher Education Facilities, the Council, and the Governor, have all recommended that Bland be included in the state's two-year community college system.[2] In

pressing for escalation, the representatives of William and Mary and Bland seek a goal almost without precedent. While other two-year colleges have been escalated, only in one other instance has Virginia established in the same community two full-fledged colleges offering similar curricula and degrees. The single exception is in Norfolk, where Old Dominion College, more than 98% white, and Norfolk State College, nearly 98% black, are located. Three two-year colleges recently have been escalated to four-year, degree-granting institutions. They are George Mason, in Fairfax County, Clinch Valley, in Wise County, and Christopher Newport, in Newport News. However, in none of these localities is there any other state supported four-year college. From the evidence, it is reasonable to infer, therefore, that the purpose and effect of Bland's escalation is to provide a four-year college for white students who reside nearby. There can be little doubt that this will contribute to the perpetuation of Virginia's dual system of higher education.

■ The Supreme Court has long held that the 14th amendment forbids racial discrimination in higher education. Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950); Sipuel v. University of Oklahoma, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247 (1948); Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938). And the doctrine of "separate but equal" college facilities for Negroes has been expressly repudiated. Florida ex rel. Hawkins v. Board of Control, 350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 486

---

2. See State Council of Higher Education for Virginia, The Virginia Plan for Higher Education, p. 40 (1967); Virginia's State Plan: Response to Department of Health, Education and Welfare Relative to Title VI, Civil Rights Act of 1964, p. 16 (1970).

The Council also recommended that Patrick Henry College and Eastern Shore, which are two-year branches of the University of Virginia, should be transferred

to the community college system. Since the trial of this case, the Board of Visitors of the University of Virginia accepted this recommendation and authorized the transfer. Richmond Times-Dispatch, Apr. 4, 1971, § C, p. 2, col. 2. After the transfer is completed, Bland will remain the only two-year state supported college in Virginia not part of the community college system.

(1956); Alabama State Teacher Ass'n v. Alabama Public School and College Auth., 289 F.Supp. 784 (M.D.Ala.1968), aff'd mem., 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969); Sanders v. Ellington, 288 F.Supp. 937 (M.D.Tenn. 1968). Nevertheless, the defendants (with the exception of Virginia State) insist that the state has complied with the 14th amendment by terminating its former policy of segregating students and faculty. Good faith admission and employment policies administered without regard to race, coupled with freedom of choice, they urge, are all that the Constitution requires of a state. In support of their argument they rely on the Supreme Court's memorandum decision summarily affirming Alabama State Teachers Ass'n v. Alabama Public School and College Auth., 289 F.Supp. 784, 789 (M.D.Ala.1968), aff'd mem., 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969), where the district court said:

> "We conclude, therefore, that as long as the State and a particular institution are dealing with admissions, faculty and staff in good faith the basic requirement of the affirmative duty to dismantle the dual school system on the college level, to the extent that the system may be based upon racial considerations, is satisfied."

This, say the defendants, is the controlling law of the case.

We cannot subscribe to the proposition that the Supreme Court represented in a one sentence memorandum decision that it approved every statement in the district court's opinion. The rule is appropriate for the result reached in *Alabama State Teachers Ass'n*, but removed from its context, it does not furnish a universal definition of a state's obligation to abolish a racially dual system of higher education. See Sanders v. Ellington, 288 F.Supp. 937, 942 (M.D. Tenn. 1968); Note, The Affirmative Duty to Integrate in Higher Education, 79 Yale L.J. 666 (1970).

The facts in *Alabama State Teachers Ass'n* differ significantly from the case before us. There a three-judge district court refused to enjoin the construction in Montgomery of a new four-year branch of Auburn University, a historically white state institution. The court recognized that the state has an affirmative duty to dismantle the dual system of higher education. However, since the branch was to be a new school and had no racial identification, the record did not support plaintiffs' speculations that the new branch was for white students. On the strength of assurances that the Auburn branch would treat admissions, faculty and staff without discrimination, the court expressed confidence that the new branch would be administered as "just a school." The court also relied on the absence in Montgomery of any other four-year college—black or white—that possessed the educational resources of Auburn. In addition, Auburn, the parent institution, was complying in good faith with a court order to integrate its facilities, and it was actively recruiting black faculty members.

The situation at Bland is not the same. Bland already has a ten-year history of an all-white faculty and a virtually all-white student body. Second, unlike the black school in Montgomery, which was primarily a teachers' college, Virginia State's increasingly integrated faculty offers a full range of courses, which Bland would largely duplicate. Finally, the racial composition of students and faculty at Bland and William and Mary do not permit us to predict confidently that Bland will soon shed its racial identity and be operated as "just a school."

The defendants' argument is reminiscent of the dictum in Briggs v. Elliott, 132 F.Supp. 776, 777 (E.D.S.C. 1955): "The Constitution * * * does not require integration. It merely forbids discrimination." But this dictum, long followed by the courts of this circuit, is now "dead." Walker v. County School Bd. of Brunswick County, 413 F.2d 53, 54 n. 2 (4th Cir. 1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 753, 24 L.

Ed.2d 755 (1970). In its place is a positive mandate charging the states "with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Bd. of New Kent County, 391 U.S. 430, 437, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). In *Green,* though the Court was dealing with discrimination affecting public school pupils, it defined a constitutional duty owed as well to college students. The means of eliminating discrimination in public schools necessarily differ from its elimination in colleges, but the state's duty is as exacting. Thus, to paraphrase *Green,* 391 U.S. at 442, 88 S.Ct. 1689, a state is obliged to convert its white colleges and black colleges to just colleges. See Sanders v. Ellington, 288 F.Supp. 937, 942 (M.D.Tenn.1968). The record discloses that Virginia has taken important steps in this direction. All Virginia colleges now admit students of both races, and there is no evidence that the state discriminates with respect to appropriations. But these measures have not abolished the racial identity of its colleges.

■■ We need not trace the perimeter of a state's obligation to dismantle all racial characteristics of a system of higher education that was initially segregated by law. It is sufficient for the purposes of this case to hold, as we do, that one agency of the state, Bland, cannot impede another agency of the state, Virginia State, in its efforts to fully integrate its student body. Therefore, the provisions of Item 600 of the Appropriations Act, which provide for the escalation of Bland, offend the 14th amendment. Recently, the Supreme Court, speaking of public schools, admonished:

"In devising remedies where legally imposed segregation has been established, it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment is not used and does not serve to perpetuate * * * the

dual system." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 2, 91 S.Ct. 1267, 1270, 1279, 28 L.Ed.2d 554 (1971).

This admonition, we believe, also applies to remedies for eliminating a dual system of higher education. Accordingly, we will enjoin Bland and its parent, William and Mary, from escalating Bland into a four-year college.

■ The record does not support the request for the merger of Bland and Virginia State. Bland can perform a valuable service as a two-year college. This is the role that the Commission, the Council, and the Governor, have recommended for it. No present need has been established for adding its facilities to Virginia State. These facts are recognized by the plaintiffs, who speak of the "ultimate merger" of the institutions, and by Virginia State officials who do not press for this relief. The plaintiffs' prayer, however, is not without precedent. E. g., Bradley v. Board of Public Instruc., Civ. No. 64–98–T (M. D.Fla., Mar. 15, 1965). Future developments at Bland or Virginia State may alter the present situation, but rather than retain this case on the docket for eventualities that may never occur, we deny this relief without prejudice.

■ We also deny the plaintiffs' request for an order directing the Governor and the Council to prepare a plan for the desegregation of all state colleges and universities. Again we recognize that there is precedent for relief of this kind. E. g., Sanders v. Ellington, 288 F.Supp. 937 (M.D.Tenn.1968). But the persons necessary for adjudicating this phase of the case have not been sued. The legislature vested control over each institution in its board of visitors, not the Governor or the Council. See generally Va.Code Ann., §§ 23–5 through –16 (Rep.Vol. 1969). Any plan drawn by the Council would be advisory only. Consequently, we deny relief on procedural grounds without comment on its merits.

The motion to dismiss the Governor and members of the Council for failure to state a claim against them is granted.

WALTER E. HOFFMAN, District Judge (dissenting in part):

Reluctantly, but nonetheless firmly, I must disagree with the majority opinion as it approaches the doctrine of racial balancing in institutions of higher learning. Without the slightest guideline for the future, it affords a dangerous precedent which may be disruptive of the system of colleges and universities in Virginia and elsewhere, more especially the Community College system so recently established by the General Assembly of Virginia. It may well invite attacks upon every appropriation act involving state-supported institutions of higher learning, even to the point of prohibiting the construction of additional buildings so desperately needed as more students, white and black, seek the advantages to be derived from a college education.

While agreeing with the majority that Virginia State and Bland should not be required to merge and that the Governor and the State Council of Higher Education for Virginia should not be directed to prepare a plan for the desegregation of all state colleges and universities, I do so not only for the reasons asserted by the majority but also because of my comments herein.

The propriety of a three-judge court in this case is, I believe, resolved by Alabama State Teachers Ass'n v. Alabama Public School and College Authority, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969), wherein Mr. Justice Harlan dissented for want of jurisdiction of the three-judge court and Mr. Justice Douglas intimates his agreement with the assertion of three-judge court jurisdiction. It is true that the Alabama case was not the subject of an opinion by the Supreme Court other than granting the motions to affirm and thus affirming the judgment of the three-judge court reported in 289 F.Supp. 784 (M.D.Ala., 1968), but an examination of the jurisdictional statement and the two motions to affirm as filed in the Supreme Court adequately reveals that all parties tacitly agreed that the three-judge court had jurisdiction over the matter. As the Supreme Court raised the issue of jurisdiction on its own initiative, as disclosed by the dissenting opinions of Justices Harlan and Douglas, I, along with my colleagues, agree that we are bound by the Alabama decision. I foresee, however, that a multitude of cases will develop by reason of the majority opinion, all with the attendant difficulties presented in connection with three-judge court proceedings.

Just as we are bound to follow the Supreme Court on the three-judge court issue, I feel equally obliged to adhere to the principles enunciated by the highest court of the land in granting the motions to affirm on the merits of the Alabama case. The majority is probably correct in stating that the mere granting of a motion to affirm does not, in itself, make such action tantamount to incorporating the three-judge court opinion as the final opinion of the Supreme Court. But as Mr. Justice Douglas so emphatically stated in indicating his desire to note probable jurisdiction and set the case for argument,[3] the merits of the case were obviously considered.

The attempts to disassociate the Alabama case with the present controversy are, in my opinion, distinctions without differences. The record in Alabama conclusively established, as the district court opinion noted, that "Alabama has traditionally had a dual system of higher education" and "the dual system in

3. The pertinent observations of Mr. Justice Douglas are as follows:

"Can we say in 1969 that a State has no duty to disestablish a dual system of higher education based upon race? The three-judge court in a careful opinion seems to draw a line between elementary and secondary schools on the one hand and colleges and universities on the other. The inference is that if this were an elementary school, the result would be different."

higher education has not been fully dismantled." The same statements apply with equal force to Virginia, although it would appear that Virginia has made more progress in desegregating the colleges and universities. The solution is not, however, in blocking the progress, escalation or improvement in the individual colleges and universities as the majority so holds. It would be a relatively simple procedure to completely dismantle the dual system of higher education in Virginia by "phasing out" Virginia State College near Petersburg and Norfolk State College at Norfolk, each predominantly black and absorbing 81% of all black students attending state-supported colleges and universities in Virginia. The tragedy of such action would seriously affect the opportunities of worthy black students to secure a college education. It could be argued that the thirteen (13) predominantly white state-supported colleges or universities would be appropriate to "phase out," but this would result in even greater disruption as Virginia State and Norfolk State could not begin to accommodate the students at these institutions of higher learning.

When the *Alabama* case was decided, the only degree-granting senior college in Montgomery and the immediate area was Alabama State College which, in 1967, had two (2) white students out of a total of 1800 and two (2) white faculty members out of a total of 85 teachers. The only other institution of higher learning in the Montgomery area was the University of Alabama Extension Center which, in 1967, was small, predominantly white, and nondegree-granting, providing some college courses, mostly given at night.

It was in this setting that the Montgomery Chamber of Commerce, an all-white organization, through its Education Committee, also all-white, saw fit to promote additional college facilities. Initially it was deemed appropriate to expand the Alabama Extension Center operated by the predominantly white University of Alabama. When the latter declined, negotiations turned to Auburn University which first admitted a Negro student in 1964 as a result of court action.[4]

Finally, Auburn agreed to take over the University of Alabama Extension Center, and expand it to form a new branch of Auburn in Montgomery.[5] Accordingly, the Alabama Public School and College Authority was authorized, by legislative action, to raise money to establish the four-year college which my colleagues now denominate as "new." The Chamber of Commerce created an all-white site selection committee and Auburn set up an all-white educational program committee. No individual Negro, Negro groups, or Negro institutions were consulted with respect to the planning or needs of the proposed "new" institution. As the *Alabama* three-judge court said, those in authority "apparently did not seriously evaluate Alabama State College's potential as an alternative" and, in lieu thereof, selected a small, nondegree-granting center, offering primarily night school courses, as

4. In 1967, when the case was filed, Auburn had only 41 blacks out of a total enrollment of about 13,000, and three (3) part-time Negro teachers out of a total faculty of approximately 800.

5. The majority attempts to distinguish the Alabama case by saying that "since the branch was to be a *new* school and had no racial identification, the record did not support plaintiff's speculations that the new branch was for white students." In one sense of the word, I suppose that it was a "new" school, but the record shows

that Auburn *took over* the existing Alabama Extension Center. In effect, Auburn merely escalated the Alabama Extension Center into a day institution and made it a four-year, degree-granting university. I have difficulty in seeing the distinction between this situation and what exists in the Petersburg area where Virginia State and Bland are located. An examination of the record in *Alabama* will adequately demonstrate that there was far more proof of potential perpetuation of the dual system than exists in the present litigation before this court.

the place for expansion. No consideration was given to establishing a program in cooperation with Alabama State, and the purportedly "new" institution was intended to have essentially the same curriculum, with an emphasis on education, liberal arts, and business, all as existed at Alabama State.

Moreover, the record in *Alabama* conclusively establishes that student recruitment efforts for the "new" Auburn branch were confined solely to white or predominantly white high schools. In December 1967 the white Director of High School and College Relations at Auburn, visited three white high schools in Montgomery, two public and one private, but failed to visit any of the four Negro high schools. On another recruiting trip to a different area, the same individual visited a white high school, but passed up the two Negro high schools.

As with respect to Bland, the Auburn branch at Montgomery was to be for all students, white and black. There is no contention that Bland has rejected any qualified Negro applicant since its inception in 1961, at which time there was no objection by anyone associated with Virginia State. Indeed, in 1970 all 17 blacks who applied for admission to Bland were accepted,[6] with 14 remaining. Four are receiving financial assistance through a scholarship program. Another accepted Negro was offered financial aid but elected not to enter Bland. At least two hold positions of honor and trust as representatives on the Honor Court and clubs. Moreover, the record demonstrates that since 1967, when three blacks applied and were admitted, thirty-four blacks have applied and thirty-three have been admitted. I trust that we can assume that the single

black applicant who was denied admission was hopelessly unqualified.

Virginia State is primarily a college equipped to handle resident students in dormitories. Only about 15% of the total enrollment of 2,524 commute. On the other hand, Bland has no dormitory facilities and the entire student body of 841 commute. The basic tuition at Virginia State is $690.00 per annum, as contrasted with $400.00 for Bland. At best, the evidence shows that there are presently 12 white students at Virginia State who transferred from Bland, presently a two-year, nondegree-conferring institution, for the purpose of completing their college education. Since 1965, through the 1970–71 session, a total of 19 transfers from Bland to Virginia State have been effected. It is on this basis that the majority concludes that Bland's escalation will tend to perpetuate the dual system of higher education. There is no suggestion that Virginia State will reduce its tuition of $690.00 per annum and, consistent with the view that all reasonable efforts should be made to financially assist worthy students in obtaining a college education, I decline to become a party to a finding which indicates that the escalation of Bland will encourage or perpetuate the dual system. Indeed, it is not unlikely that black students, being desirous of obtaining a four-year college education in a now predominantly white college at a considerably less expense, will appreciably increase the black enrollment at Bland, thus assisting in reducing the percentage ratio of white to black. Conceding arguendo that the 19 transfers would have remained at Bland if escalated, we are assuredly resting on a *de minimis* issue in thwarting the progress of higher education in Virginia.

---

6. The majority point to the fact that it was not until the catalogue for the 1970–71 session that Bland *affirmatively* stated that the college was "open to all students regardless of race." They fail to state that prior catalogues *did not mention* race at all. I do not attribute to the present-day high school students, white or black, such apparent lack of knowledge as to the rights of students in applying for admission to state-supported colleges or universities. Nor do I feel that Bland should be charged with any intimation of "bad faith" by reason of such action or inaction.

It is, in my opinion, rank speculation to assume that black students will not seek admission to Bland, and white students will decline to apply at Virginia State. I would agree that Virginia State will remain predominantly black, and Bland predominantly white, for an indefinite period of time. But the reason is not due to denial or discouragement of admission. If we are honest with ourselves, it is because, as a general rule, blacks prefer socializing with blacks, and whites with whites. No mere court orders are going to change the nature and desires of human beings, and only time will aid in minimizing these wishes of the individual person.

The majority relies upon the testimony of Dr. Russell, President of Virginia State College since November 1, 1970, and prior thereto a resident of Connecticut, in support of the conclusion that the escalation of Bland "would have a tremendously disastrous effect upon Virginia State's ability to attract and to hold white students from this particular area [within a radius of 45 miles of Petersburg]." Dr. Russell conceded that he had made no study of the problem and agreed that Bland, as it now exists, only "presents to us the *possibility* of feeding to us [Virginia State] at the junior level, particularly white students from this locale." That *possibility*, over a period of six years, has resulted in 19 transfers, and we assume that all are white students although the record does not so confirm this statement. Dr. Russell points to the similarity of course offerings at the two colleges and assumes that this would continue if Bland is escalated. Conceding that the basic courses for the first two years of college are essentially the same, as they are in nearly every institution of higher learning, Dr. Russell and the majority overlook the fact that substantial differences will appear on the junior and senior year levels,[7] with Bland emphasizing Management Information Science, Marketing, Banking, Nursing and other types of concentration. Moreover, the State Council on Higher Education, which recommended, in December 1969, that no existing institution be changed to a higher degree level until that body conducted a study, must still approve the programs of concentration before Bland opens as an escalated college. This fact is, in itself, sufficient protection to assure that the programs of Virginia State and Bland will not be excessively overlapping.

As Judge Johnson, speaking for the Court in the *Alabama* case, said:

"Plaintiffs [Alabama State] fail to take account of some significant differences between the elementary and secondary public schools and institutions of higher education and of some related differences concerning the role the courts should play in dismantling the dual systems. Public elementary and secondary schools are traditionally free and compulsory. Prior to 'freedom of choice,' children were assigned to their respective schools. This could be done with equanimity because, in principle at least, one school for a given grade level is substantially similar to another in terms of goals, facilities, course offerings, teacher training and salaries, and so forth. In this context, although reluctant to intervene, when the Constitution and mandates from the higher courts demanded it, we felt that desegregation could be accomplished, and that the requirements of the law would be met, without our being involved in a wide range of purely educational policy decisions. Accordingly, we felt, in dealing with the problem of desegregating the elementary and secondary public schools, that we could and should review decisions concerning the impact of site selection for new construction or ex-

---

7. In a press release by Virginia State announced since this case was argued, it was stated that its Schools of Home Economics and Industries will be elim-

inated, and its School of Agriculture will become a division of the School of Education, all being irrespective of Bland's proposed escalation.

pansion without overreaching our area of competence.

"Higher education is neither free nor compulsory. Students choose which, if any, institution they will attend. In making that choice they face the full range of diversity in goals, facilities, equipment, course offerings, teacher training and salaries, and living arrangements, perhaps only to mention a few. From where legislators sit, of course, the system must be viewed on a statewide basis. In deciding to open a new institution or build a branch or expand an existing institution, and in deciding where to locate it, the legislature must consider a very complicated pattern of demand for and availability of the above-listed variables, including, also, impact on the dual system. We conclude that in reviewing such a decision to determine whether it maximized desegregation we would necessarily be involved, consciously or by default, in a wide range of educational policy decisions in which courts should not become involved."

This, together with the quotation from the *Alabama* case in the majority opinion, is the crux of the case which was summarily affirmed by the Supreme Court.[8] I am unwilling to embark upon a field of speculation as to what the Supreme Court may say in the future. It

is sufficient to await the next action by the nation's highest court.

The effect of the injunction this day granted by the majority is to permanently fix the status of Bland as a two-year college. My colleagues point to the fact that the Commission, the Council, and the Governor recommended that Bland remain a two-year college. If that reasoning serves as an excuse for issuing the injunction then it violates the syllogism expressed in Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27, a case involving the District of Columbia Redevelopment Act, where the Supreme Court said, "We do not sit to determine whether a particular * * * project is or is not desirable." And in Harrison-Halsted Com. Group v. Housing & Home Finance, 310 F.2d 99, 105 (7 Cir., 1962), in a case involving the location of a branch of the University of Illinois, the Seventh Circuit said: "Courts have consistently denied the standing of citizens to challenge the choice made by public authorities between different and competing public uses." As I read the majority opinion, it appears to me that we are to second-guess the General Assembly of Virginia and the College of William and Mary, the latter authority having studied the matter since 1965 when a master site plan was prepared and approved in principle with its primary thrust or focus

---

8. That the Supreme Court considered the impact of such reasoning is apparent from footnote 2 of the dissenting opinion of Mr. Justice Douglas who stated: "This is on its face an amazing statement as the forerunners of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, were cases involving higher education," then citing four cases which are now relied upon by the majority opinion. The fact remains that the majority of the Supreme Court apparently thought otherwise as the *Alabama* case was affirmed.

The four cases cited by the majority and Mr. Justice Douglas were obvious illustrations of true discrimination *in fact*, and do not touch upon the problem

here presented. In Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114, a Negro was denied admission to a law school solely by reason of his race; McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149, involved a Negro required to occupy a special table in the library and cafeteria and a special row reserved for Negroes in the classrooms; Sipuel v. University of Oklahoma, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247, is identical with *Sweatt*; Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 a Negro was ordered admitted to a law school operated for whites, because no law school was provided for Negroes. I fail to see the analogy of these four cases with the issues in controversy.

being in terms of expanding Bland into a four-year college.

It was in 1966 that the General Assembly of Virginia, despite the State Council's inclusion of Bland as a college to be converted into the Community College system, excluded Bland, Christopher Newport (Newport News), Clinch Valley and George Mason—all then two-year colleges—from the Community College system. Since that date the three last-named colleges have been escalated without protest. Only Bland remains. Wherever a college such as the foregoing is escalated, a new Community College is founded. Already in existence only 8 or 9 miles from Bland is the John Tyler Community College. Eight miles from Christopher Newport was established the Thomas Nelson Community College.

What Virginia has done through its Community College Act is to bring two-year colleges to the people, rather than having the students move their residences at considerable expense. When more students attend a large number of two-year colleges, it follows that many more will be in attendance at the junior and senior year levels. The majority states that "it is reasonable to infer that the purpose and effect of Bland's escalation is to provide a four-year college for white students who reside nearby." They overlook the ten-year projections of enrollment which will require either the escalation of two-year operating colleges or the construction of entirely new facilities.[9]

In the final analysis only the legislature has the prerogative of determining the wisdom, necessity and location of any institution of higher learning. The State Council never conferred with The College of William and Mary, nor did it assign any reason in its report, concerning its views that Bland should be included as a part of the Community College system. The same is true as to the Commission on Higher Education Facili-

ties and the Governor. Adhering to the prior statement that courts should refrain from determining the merits of choices by public authorities, I can add only that the record falls far short of justifying the majority's conclusion that the purpose and effect of Bland's escalation is to provide a four-year college for white students. However, I do not profess to be an educator armed with the wisdom of determining the necessity for a four-year college in the area involved.

Manifestly the majority opinion will play havoc with Old Dominion University and Norfolk State College, both located in Norfolk approximately 7 miles apart. Old Dominion, now the second largest student enrollment in Virginia, has grown by leaps and bounds. The same is true as to Norfolk State, a clearly competing college. Each is predominantly white and black, respectively, by heavy margins, even greater than Virginia State and Bland. Each college is expanding its campus facilities to accommodate the demands. New buildings are constantly being erected. It cannot be denied that the construction of a single building would undoubtedly play a small part in perpetuating the dual system in that whites are inclined to select Old Dominion and blacks prefer Norfolk State. As the facilities are increased to care for more students, while no discrimination exists in the admission, it is logical to assume that the much greater percentage of the increased enrollment will attend Old Dominion if white, and Norfolk State if black. Under the majority holding, all capital appropriations for the use of these fine institutions of higher learning can be effectively enjoined for an indefinite period, and probably forever.

We turn to the faculty. Virginia State has, during the past two or three years, been commendably successful in increasing the number of whites on the faculty. Bland has met with little or no

---

9.   1967 (Actual)        1977 (Projected)

| | | |
|---|---|---|
| 62,753 | 4-year colleges | 117,475 |
| 12,160 | 2-year colleges | 61,150 |

success in securing black professors. The fact is that qualified black professors occupy top position in a seller's market. What has happened is perhaps best analyzed by Dr. Russell, President of Virginia State, who points to the successful procurement of white faculty members in predominantly black colleges because "as there has been more equitable treatment of - black professors throughout the country, we have had a large number of white professors to join our faculty here." Qualified black professors are greatly in demand by predominantly white colleges in order to comply with various aspects of federal law, grants, and decisions. In turn, this is forcing white teachers to seek employment in predominantly black colleges. The reverse of the situation is not apparent.

There are 50 to 60 faculty and administration members at Bland. Efforts have been made to secure the services of black professors, but without success other than on a limited basis.[10] Dr. Boone, once the Dean of Faculty at Virginia State, was interviewed as to an administrative position at Bland, but to no avail. Dr. Tucker, former President of Virginia State, was contacted by Bland in efforts to secure a sociology professor and an English professor with a Ph.D. In each instance it was the desire of Bland to secure a black faculty member. To this date no full-time black faculty or administrative member has been obtained.

One must recognize that it is no longer possible to discharge qualified faculty members for no reason at all. In essence, a vacancy must occur by reason of death, protracted illness, retirement, or resignation. When we compare Bland's efforts and the results at Auburn, where only three part-time teachers out of 800 are black, I believe that Bland, a relatively new college, is entitled to additional time to accomplish its purpose of

procuring some black faculty members. It may well be that Virginia State, by reason of its proximity to Bland, is impeding Bland in its efforts to desegregate its faculty.

The recruitment programs for minorities at both Virginia State and Bland have been active—at Virginia State since 1965; at Bland since 1968. In 1968, 1969 and 1970, Bland used radio and television programs expressing its interests in "all students." On at least one program over WRVA in August 1969, Bland's Dean of Admissions and Administrative Assistant to the President, recalls that he told the public that Bland "wanted both black and white students." Virginia State's enrollment is thrice that of Bland. Thus, the figures of 70 whites attending Virginia State and 14 blacks attending Bland are not too far out of line, bearing in mind that the recruitment efforts at Virginia State have been more extensive and for a longer overall period.

Virginia State competes with colleges other than Bland although, to read the majority opinion, one would conclude that Bland was the sole competitor. These competing institutions are located well within the 45-mile radius which Virginia State classifies as the crucial area. A few of these colleges are private; others state-supported. Without endeavoring to enumerate the competing colleges, I mention Virginia Commonwealth University, Virginia Union, St. Paul, University of Richmond, Randolph-Macon, John Tyler, William and Mary, and perhaps others. Conceding, if I must, that escalation of Bland will divert some few students who might otherwise attend Virginia State, with the large number of competing institutions in the radius discussed it is just as likely that other colleges will compete as much, if not more.

Finally, I revert to the *Alabama* case and the opinion written by a jurist more

10. In 1969, a Mrs. Woodson, a teacher at Virginia State, taught art in the evening college at Bland. Edward L. Smith, the recruitment officer at Virginia State, has served as a visiting professor at Bland.

experienced in the problems of desegregating educational facilities than anyone else in the nation. Judge Johnson is known to be an advocate of desegregation with its recognized benefits in the educational field. He feels, as I feel, that there are many problems confronting colleges and universities which do not exist on the elementary and secondary levels. For example, it is relatively simple to desegregate the faculties in elementary and secondary schools because the teachers are assigned to particular schools. No such assignment system exists on the college level. Judge Johnson feels, as I feel, that although Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716 (1968), held that "freedom of choice" was only constitutional if it operated effectively to dismantle the dual school system, it does not necessarily follow that Green is applicable to a complex college system of state-supported institutions. I do not agree that the majority should paraphrase Green by saying that the state is obliged to convert its predominantly white or black colleges into "just colleges," without any guidelines, except insofar as the rights with respect to admissions, use of facilities, etc., may be concerned and, as to these points, I would never differ with my colleagues.

The majority makes a brief reference to Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S. Ct. 1267, 28 L.Ed.2d 554 (decided April 20, 1971), as partial authority for the position taken. They apparently interpret the quotation as applicable to colleges as well as elementary and secondary public schools. They enlarge the words "future school construction" to include an escalation of an existing college

facility. Overlooked, however, is other language in Swann which states that "Judicial authority enters only when local authority defaults." There is nothing in the history of Bland, established long after the decision in Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954), nor in the record in this case, which would justify a finding that the Commonwealth of Virginia or the College of William and Mary has defaulted in establishing and maintaining good faith admission and employment policies and, as the majority concedes, state appropriations have been distributed with an equal hand. I find nothing in Swann which leads to the conclusion reached by the majority.

The record reflects that Virginia State has consistently had an increased enrollment, despite the presence of Bland seven miles distant,[11] during the entire period of Bland's existence. When Bland opened its doors in 1961, Virginia State enrolled 1,778 students, an increase of 204 over the prior college year. During the present college year, Virginia State had an enrollment of 2,524 according to the answers to interrogatories, which figure does not include the summer or graduate schools. Assuredly, Bland has not impeded the growth of Virginia State, and the majority does not so hold. The finding of discrimination by escalation is to the effect that "escalation of Bland would hamper Virginia State's efforts to desegregate its student body"—apparently to the maximum extent of nineteen potential transferees over a period of six years. If we are to balance the interests, as suggested in Swann, the rights of the commuting students, white and black, obtaining a college education at an expense of $290.00 per annum lower

11. The majority states that the three two-year colleges which have recently been escalated to four-year, degree-granting institutions are not located in areas where there are any other state-supported four-year colleges. Christopher Newport in Newport News is located about 25 miles from the College of William and Mary, and the same distance

from Old Dominion University and Norfolk State College. All are within the critical commuting area. True, Bland is only seven miles from Virginia State. On this difference of eighteen miles the majority attempts to justify the escalation of other colleges while denying the same to Bland.

than Virginia State, should be paramount.

If the Supreme Court saw fit to summarily affirm the able opinion of Judge Johnson, the thrust of which was to protect freedom of choice on the college level, under facts which are identical with the existing controversy, it is sufficient for me. I respectfully dissent and urge that Bland should be permitted to escalate in accordance with the action of the General Assembly of Virginia.