# ORDER

**VIRGINIA:**

In the Court of Appeals of Virginia on Tuesday, the 18th day of August, 1992.

Doretha Winfield, Appellant

against

Commonwealth of Virginia, Appellee

Before Chief Judge Koontz, Judges Baker, Barrow, Benton, Coleman, Duff, Moon, Willis, Elder and Bray.

COUNSEL

Michael Morchower (S. Hunter Woltz; Morchower, Luxton and Whaley, on brief), for appellant.

Marla Lynn Graff, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

## UPON REHEARING EN BANC

OPINION

In *Winfield v. Commonwealth*, 12 Va. App. 446, 404 S.E.2d 398 (1991), a panel of the Court affirmed the judgment of the trial court that the Commonwealth's Attorney satisfied the requirements of *Batson v. Kentucky*, 476 U.S. 79 (1986), in explaining his exercise of peremptory strikes against four black veniremen. After the release of our opinion, the Supreme Court decided *Hernandez v. New York*, 500 U.S. 352 (1991), explaining the standard of appellate review of a trial court ruling on a *Batson* challenge. The court said:

[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal.

*Id.* at 1868.

Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding will "largely turn on evaluation of credibility." In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Id.* at 1869 (citations omitted).

[W]e decline to overturn the state trial court's finding on the issue of discriminatory intent unless convinced that its determination was clearly erroneous. . . . "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."

*Id.* at 1871-72 (citations omitted).

For the reasons stated in the panel's majority opinion, and upon the further authority of *Hernandez*, the judgment of the trial court is affirmed and the stay of this Court's April 30, 1991 mandate is lifted.

*Affirmed.*

Benton, J., with whom Koontz, C.J., and Barrow, J., join, dissenting.

In the previous decision of this appeal, *Winfield v. Commonwealth*, 12 Va. App. 446, 404 S.E.2d 398 (1991), this Court failed to apply the appropriate standard in judging the reasons advanced by the prosecutor for the exercise of the prosecutor's peremptory strikes. The majority now reaffirms that error. In addition, based upon a misreading of *Batson v. Kentucky*, 476 U.S. 79 (1986), and a misreading of the application of *Batson* in *Hernandez v. New York*, 500 U.S. 352 (1991), the majority upholds the prosecutor's purposeful, discriminatory use of peremptory challenges to

exclude African-Americans from the jury. I dissent.

The Supreme Court's holding in *Batson*, as reaffirmed in *Hernandez v. New York*, 500 U.S. 352 (1991), established a three-part process for analyzing claims that a prosecutor's use of peremptory challenges violated the equal protection clause of the Fourteenth Amendment to the Constitution:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Id.* at 358-59 (citations omitted).

"In evaluating the race-neutrality of [a prosecutor's] explanation, a court must determine whether . . . the [prosecutor's peremptory] challenges violate the Equal Protection Clause as a matter of law." *Hernandez*, 500 U.S. at 359 (emphasis added). The initial inquiry in this evaluation must focus upon whether "[t]he prosecutor . . . articulate[d] a neutral explanation related to the particular case to be tried." *Batson*, 476 U.S. at 98.

A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation.

*Hernandez*, 500 U.S. at 360. The inquiry is not satisfied by conclusory abstractions. The Supreme Court has been consistent in stating:

It [is] impermissible for a prosecutor to use his challenges to exclude blacks from the jury "for reasons wholly unrelated to the outcome of the particular case on trial" or to deny to blacks "the same right and opportunity to participate in the administration of justice enjoyed by the white population."

*Batson*, 476 U.S. at 91 (quoting *Swain v. Alabama*, 380 U.S. 202, 224 (1965)).

"[T]he role of the trial judge in assessing the prosecutor's motive only kicks in once a race-neutral justification has been offered." *United States v. Bishop*, 959 F.2d 820, 827 (9th Cir. 1992). In *Bishop*, the court ruled that in order for a prosecutor's explanation to be viewed as facially race-neutral, there must be a nexus between the characteristic of the juror upon which the prosecutor based the strike and how that characteristic might affect a juror's approach to the specific facts of the trial. *Id.* at 825. There can be no finding of facial neutrality if the characteristic is simply a "surrogate for racial stereotypes." *Id.* at 826. Similarly, in *Splunge v. Clark*, 960 F.2d 705 (7th Cir. 1992), the court held that where the prosecutor's neutral explanation is an obvious mask for a peremptory strike based on race, the prosecutor has not met the burden imposed by *Batson*. *Id.* at 709. The prosecutor must explain the strikes clearly and be "reasonably specific, presenting legitimate reasons that are related to the particular case." *United States v. Nichols*, 937 F.2d 1257, 1262 (7th Cir. 1991), *cert. denied*, 112 S. Ct. 989 (1992). It is only after the reviewing court ascertains both the facial validity of the prosecutor's exercise of peremptory strikes and the relationship of the stated reasons to the case being tried that it should consider whether the trial judge erred in determining whether purposeful discrimination was proved. In this process of review, "we analyze the prosecutor's explanation for his actions as a *legal issue*." *United States v. Johnson*, 941 F.2d 1102, 1108 (10th Cir. 1991) (emphasis added).

In *Hernandez*, the prosecutor struck a bilingual Latino from the jury because the juror's responses during *voir dire* caused the prosecutor to be uncertain the juror could accept an official interpreter's translation of Spanish testimony. The prosecutor also struck for the same reason another person whose ethnicity was uncertain. *Id.* at 358. The prosecutor's concern was not grounded in a mere suspicion that the juror's language ability would interfere with the juror's willingness to accept the interpreter's translation. The prosecutor's decision was based on "the specific responses and the demeanor of the [juror] during *voir dire*." *Id.* at 360. The prosecutor "even had to ask the [trial] judge to question them" on their willingness "to accept what the interpreter said as the final thing on what the record would be." *Id.* at 357 n.1. After

considering these facts, the Court found that the prosecutor's explanation was facially race-neutral. *Id.* at 361.

Unquestionably, in *Hernandez*, the prosecutor's explanation for the strikes bore a relationship to the particular case. Several witnesses were expected to testify in Spanish. A translator was to be used at trial to translate into English the testimony of those witnesses. The Court cited *United States v. Perez*, 658 F.2d 654 (9th Cir. 1981), as illustrative of "the sort of problems that may arise where a juror fails to accept the official translation of foreign-language testimony." *Hernandez*, 500 U.S. at 360 n.3. Indeed, in *Perez*, a bilingual juror challenged an interpreter's translation in the presence of the other members of the jury and was ultimately dismissed from the jury. *Perez*, 658 F.2d at 662-63. Thus, it is apparent that *Hernandez* did not change *Batson's* absolute prohibition against peremptory challenges made "for reasons wholly unrelated to the outcome of the particular case on trial." *Batson*, 476 U.S. at 91.[1]

In the case before us, Winfield made a *Batson* motion based on the prosecutor's decision to strike four African-American females from the twenty-person petit jury panel. The prosecutor first assured the trial judge that the strikes were not racially motivated and claimed that before trial he had decided to scrutinize at voir dire the African-American women ultimately stricken. The prosecutor further explained:

> [Prosecutor]: Specifically, as to Polly Dunn, I felt like that because, though the case isn't particularly complicated, I felt

---

[1] Although I do not interpret *Hernandez* to be as limiting as do the majority and Judge Coleman in his dissent, I share Judge Coleman's view that if *Hernandez* is to be interpreted to require absolute deference to the trial judge on all issues, including legal issues, the Court will have "impos[ed] such procedural and evidentiary obstacles [so as to] have severely curtailed and limited the . . . impact in affording meaningful equal protection to racial minorities to participate in administering the judicial process, which the *Batson* decision was expected to accomplish." Furthermore, I agree with Judge Coleman's view that we are not obligated to impose such obstacles because "the *Hernandez* decision does not . . . preclude states from utilizing or adopting their own procedural and evidentiary rules, as a matter of state law, to safeguard the equal protection rights of defendants and jurors recognized in *Batson* . . . and *Powers v. Ohio*, 111 S. Ct. 1364, 1373 (1991)." *See California v. Ramos*, 463 U.S. 992, 1013-14 (1983). I also believe that *Jackson v. Commonwealth*, 8 Va. App. 176, 380 S.E.2d 1 (1989), provides the analytical framework for deciding this case and should be followed.

like that —

The Court: You say "isn't" or "is?" What did you say?

[Prosecutor]: Is not particularly complicated. I felt like there were some matters that would have to be followed closely by way of introduction of evidence and based on the fact that I read that she was a retired domestic, I did not (pause) — I could only surmise that her education might limit her ability to understand what was going on. Rose Massenburg - I felt the same thing. A cosmetologist with Kate Salon, I felt like that she might have that same difficulty in understanding. My other strike was (pause) Corine Lee and I used the same logic or judgment in that particular case.

The Court: Well, what is she, retired from something?·

[Prosecutor]: She — she was — yes sir, Corine Lee was retired from the Fort Lee Laundry.

\* \* \*

[Prosecutor]: Your Honor, I might say that, you know, the only background information I have is what's provided from that list. You know, no one went out and did any investigation for me of the jurors, so based on that list, based on what I observed, based on people as they listen to your remarks, I have to make my decisions quickly by way of the strikes that I made and I can assure the court it had nothing to do with the race of these individuals involved.

The Court: Well, you made three of them you say before trial, or did you make them all — did you make four before trial?

[Prosecutor]: I made three before — I made a determination that those were people I was looking at closely to strike and it had nothing to do with their race because I wasn't aware of their race. The fourth person was a person that I had not listed as a potential strike but then based on her being a friend of the defendant, I made that decision.

The trial judge accepted the prosecutor's strikes as "based on neutral and detached reasons that had nothing to do with race." The trial judge erred.

A prosecutor cannot refute an allegation of discriminatory strikes simply by denying a discriminatory purpose or " 'affirm[ing] [his] good faith in making individual selections.' " *Batson*, 476 U.S. at 98 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)). The prosecutor must establish " 'permissible racially neutral selection criteria and procedures' " before a trial judge can pass on the facial validity of the prosecutor's explanation. *Batson*, 476 U.S. at 94 (quoting *Alexander*, 405 U.S. at 632). The list of the twenty prospective jurors available to the attorneys provided their names, addresses, professions and dates of birth. This information revealed nothing about the educational levels attained by each prospective juror. This information, nonetheless, allegedly was used by the prosecutor to determine the educational levels of the prospective jurors which he in turn used to validate his peremptory strikes. This decision to strike three African-American women from the jury while leaving several white women similarly situated, including a white housewife, bespeaks racism, pure and simple. The prosecutor's conduct eliminated African-Americans from the jury solely on the basis of racial stereotypes. The prosecutor clearly and designedly used racially stereotypical criteria about employment status to determine educational achievement.[2] The prosecutor's explanation lacked even a modicum of "facial validity." *Hernandez*, 500 U.S. at 360.

---

[2] Although the majority's order does not detail in any particulars the aspect of *Hernandez* that supports its result, the Supreme Court in *Hernandez* expressly did not approve racial stereotyping:

> Petitioner argues that Spanish-language ability bears a close relation to ethnicity, and that, as a consequence, it violates the Equal Protection Clause to exercise a peremptory challenge on the ground that a Latino potential juror speaks Spanish. He points to the high correlation between Spanish-language ability and ethnicity in New York, where the case was tried. We need not address that argument here, for the prosecutor did not rely on language ability without more, but explained that the specific responses and the demeanor of the two individuals during *voir dire* caused him to doubt their ability to defer to the official translation of Spanish-language testimony.

*Hernandez*, 500 U.S. at 360 (footnote omitted).

In focusing only upon whether the explanation was race neutral, the majority ignores an essential core element of the *Batson* test: "The prosecutor . . . must articulate a [race] neutral explanation *related to the particular case to be tried.*" *Batson*, 476 U.S. at 98. *See also Splunge*, 960 F.2d at 708-09. The prosecutor struck Polly S. Dunn, a retired domestic, Corine Elizabeth Lee, "retired - Fort Lee Laundry," and Rose Mary Massenburg, a cosmetologist, under the guise that their level of employment reflected a lack of education sufficient to understand the information presented at trial. The record demonstrates that the prosecutor's concern about education bore no relationship to the case. Winfield was charged with distributing more than one-half ounce but not more than five pounds of marijuana. Nothing about the evidence that the prosecutor presented at trial required anything more than average intelligence to understand or analyze. Drug possession prosecutions such as occurred in this case are instituted hundreds of times each day in this Commonwealth. Indeed, the prosecutor stated that the case was "not particularly complicated." No precedent exists in decisions of the United States Supreme Court or the Supreme Court of Virginia that requires this Court to defer to a prosecutor's ungrounded speculation that a superior education is required of jurors selected to consider an uncomplicated drug possession case. "Rubber stamp approval of all non-racial explanations will not satisfy the command of *Batson.*" *Jackson*, 8 Va. App. at 185, 380 S.E.2d at 6.

Requiring a nexus between the characteristic used to strike jurors and the facts of the case tends to eliminate the possibility that the prosecutor will use a surrogate to substitute for race.

The difference between *Hernandez* . . . on the one hand, and the present case on the other, is the difference between a reason — whether valid or not — and a racial stereotype. It is the difference between a criterion having a discriminatory racial impact, and one acting as a discriminatory racial proxy. It is, in short, the difference between what the Constitution permits, and what it does not.

*Bishop*, 959 F.2d at 826. Without the requirement that the race neutral explanation be "related to the particular case to be tried," *Batson*, 476 U.S. at 98, a prosecutor with a less than fertile imagination can mouth reasons to exclude African-Americans from ju-

ries with precisely the type of explanation that this Court today approves. Strikes can now survive if they are used to exclude jurors who live on streets, as opposed to roads, places, or avenues; jurors who work in occupations that suggest manual labor; jurors who wear shirts that are colored; jurors who wear sport jackets; jurors who do not wear neck ties; jurors who wear dangling earrings; jurors who wear multicolored skirts; or jurors who wear brown shoes. The list is limited only by one's imagination. Based on this decision, this Court will now defer to the prosecutor's assertion of any of these reasons, even though African-Americans are excluded and whites with the same characteristics are left on the jury.. This case proves the point.

The record further proves that the prosecutor's explanation lacked a factual basis and, when stripped to its core, was pretextual. The sinister nature of the prosecution's rationale is readily evident from a review of employment information available for several of the white female jurors. Doris Crumpler Goodyear listed her profession as "Retired -SRMC." Louise Gill Mayer described herself as an employee at Anderson School Annex. Kathleen G. Kirkpatrick was a housewife. Brigitte Lotte Pope has retired from "B & W." Alice Lee was "Asst. Mgr. - Hickory Hill Mobile Homes." The current or past employment of these five white women jurors, who were not stricken, was not described sufficiently for anyone to conclude that their educational backgrounds were superior to those of the three African-American women stricken. The prosecutor could only have concluded that their race suggested a higher level of education. Furthermore, if we are to accept the prosecution's claim that the facts of this case require some unarticulated intellectual capacity from the members of the jury, then we are tacitly agreeing with his implicit suggestion that African-Americans, as a race, lack this capacity.

The uninformed manner in which the prosecutor chose his strikes also does not support his claim that the educational level of the jury members was of any special relevance to this criminal trial. The prosecutor explained that he struck the three African-American jurors because he "felt" they lacked a desired level of education. The prosecutor never revealed what amount of schooling is required to understand the nuances of drug possession. Without ascertaining whether any evidence minimally supported the prosecutor's theory and without an explanation why the prose-

cutor chose to strike these jurors when a larger number of white jurors would have been subject to exclusion using this same criterion, this Court defers to the prosecutor's subjective, baseless judgment and, thus, condones "a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96 (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953)).

The specious nature of the prosecutor's reasoning also is exposed by his conduct. The prosecutor neither asked the jurors any questions about their educational level nor asked questions from which he might have gleaned their educational level. Indeed, the record is more emphatic. *The prosecutor did not ask the three African-American women who were stricken any questions.* In its reliance on *Hernandez*, the majority fails to appreciate that the prosecutor's conclusion in *Hernandez*, that the bilingual jurors might have difficulty accepting the translation of the official interpreter, was based on the jurors' responses and hesitance in answering questions the prosecutor posed on *voir dire.*

> As explained by the prosecutor, the challenges rested neither on the intention to exclude Latino or bilingual jurors, nor on stereotypical assumptions about Latinos or bilinguals. The prosecutor's articulated basis for these challenges divided potential jurors into two classes: those whose conduct during *voir dire* would persuade him they might have difficulty in accepting the translator's rendition of Spanish-language testimony and those potential jurors who gave no such reason for doubt.

500 U.S. at 361.

The prior opinion by this Court in this case states that the prosecutor's conclusion that the excluded African-American women "probably possessed limited education . . . might not have been correct, but it is consistent with common experience." *Winfield*, 12 Va. App. at 452, 404 S.E.2d at 402. The opinion does not disclose whether the "common experience" the majority relied upon relates to the race of the excluded women or their occupations. I know of no common experience that suggests that cosmetologists, laundry workers, or domestic workers "probably [possess] limited education." Even if we assume that the panel correctly gauged "common experience" as to the educational attainment of persons

in those professions, it remains unexplained whether that same "common experience" suggests that those occupational groups are less educated than a housewife, one who is "retired - SRMC," an employee of a school annex, or one retired from "B & W" (all jobs held by white females who were deemed by the prosecutor to be sufficiently educated to remain on the jury). Common experience also does not suggest the level of education that this Court now deems to be acceptable or required as a condition to be of service as a juror in the Commonwealth.

The prosecutor did not claim he divided the jury pool into two integrated categories of better educated and less educated prospective jury members.[3] He stated that he focused on the individuals that he struck. However, he never asked any of the petit jury members about their educational achievements. He never indicated which of the white petit jury members with jobs requiring little education he considered striking prior to *voir dire*. He never indicated to the trial judge that any behavior during *voir dire* supported his belief that the three African-American women were demonstrably less educated than the white jury members with similar or unspecified employment. In short, even in view of the prosecutor's professed lack of racial intent, the conclusions that the prosecutor asserted he derived from the available information are at best so irrelevant, stereotypical, and idiosyncratic that this Court should not conclude that they are race neutral. Where "a discriminatory intent is inherent in the prosecutor's explanation," it is invalid and this Court need not consider whether the trial judge was plainly wrong in accepting that explanation. *Hernandez*, 500 U.S. at 360. In the absence of a racially neutral explanation that actually demonstrates some relevance to the information upon which the prosecutor based his strikes and which bears some trial- related basis, I would reverse the trial judge's conclusion of law that the explanation was race neutral. "If the explanation is not race neutral for the prosecutor, it is no more so for the trial judge." *Hernandez*, 500 U.S. at 362.

---

[3] In *Hernandez*, the Court accepted the prosecutor's articulated basis for his challenges because the prosecutor divided the jury pool into two categories, each containing Latino and non-Latino jurors, of people whose responses and behaviors at *voir dire* indicated they might have difficulty accepting the translations of the interpreter and people whose behavior indicated they would not. *Id*. at 361. The trial judge conducted part of the *voir dire* on this very topic and, thus, had an opportunity also to gauge the jurors' reactions.

Even if, as erroneously held in the prior decision, this Court limited its review to whether the trial judge committed clear error in accepting the prosecutor's explanation to be race neutral, such error was present in his decision. A criteria, "otherwise neutral on its face, must not be applied so as invidiously to discriminate." *Washington v. Davis*, 426 U.S. 229, 241 (1976).

> The impact of the official action - whether it "bears more heavily on one race than another" - may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the [rationale for the action] appears neutral on its face.

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977) (quoting *Davis*, 426 U.S. at 242).

The record clearly proves that the prosecutor used his strikes in a racially discriminatory fashion. " '[A]n invidious discriminatory purpose may often be inferred from the totality of relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another.' " *Hernandez*, 500 U.S. at 363 (quoting *Davis*, 426 U.S. at 242). The prosecutor exercised each peremptory challenge to exclude only African-Americans. There was no logical reason to conclude that the excluded African-American women were likely to be less educated than a white housewife, or white employee at a school annex, or a white retired employee of "B & W." "[D]isproportionate exclusion of members of a certain race" is evidence that may constitute "a pretext for racial discrimination." *Hernandez*, 500 U.S. at 363. "The Equal Protection Clause guarantees the defendant that the State will not exclude members of [her] race from the jury venire on account of race, or on the false assumption that members of [her] race as a group are not qualified to serve as jurors." *Batson*, 476 U.S. at 86 (citations omitted).

The prosecutor's claim that he targeted all three women for scrutiny after considering their job descriptions but before learning their race is highly suspect. Petersburg is a city with a history of racial discrimination in housing. Its African-American popula-

tion exceeds seventy percent of the city's population.[4] It is not startling to suggest that the street address and occupations on a jury list would be strongly suggestive of the race of a prospective juror to one who prosecutes in that city.

> Residence, as it were, often acts as an ethnic badge. As study after study has showed, residence, especially in urban centers, can be the most accurate predictor of race — more accurate, indeed, than social class. *See, e.g.*, Kain, *The Influence of Race and Income on Racial Segregation and Housing Policy*, in Housing Desegregation and Federal Policy 99, 102 (1986); Note - *Racial Diversity in Residential Communities: Societal Housing Patterns and a Proposal for a "Racial Inclusionary Ordinance"*, 63 S. Cal. L. Rev. 1151, 1167-69 (1990). As one commentator remarked, "[O]ne legacy of the [racial] caste system has remained largely intact: the urban ghetto." Comment — *Individual Rights and Demographic Realities: The Problem of Fair Housing*, 82 N.W.L. Rev. 874, 875 (1988).

*Bishop*, 959 F.2d at 828.

In any event, the prosecutor claims to have made his final decisions only after the *voir dire*. It is difficult to imagine how the prosecutor could draw a non-racial conclusion that his initial estimate that Polly Dunn, Rose Massenburg, and Corine Lee lacked sufficient education to understand the evidence in a fairly simple criminal trial was reasonable when they said nothing at *voir dire*. "Where the prosecutor's neutral explanation is an obvious mask for a race-based challenge, the prosecutor has not met his burden under *Batson*." *Splunge*, 960 F.2d at 709.

> Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. Discrimination within the judicial system is most pernicious because it is "a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others."

*Batson*, 476 U.S. at 87-88.

---

[4] *1990 U.S. Census Population by Race*, U.S. Dept. of Commerce, Census Bureau.

For these reasons, I would hold that the prosecutor did not offer a facially race-neutral explanation, that the explanation the prosecutor advanced was unrelated to the case to be tried, and, further, that the trial judge clearly erred in ruling that the prosecutor's conduct lacked a racially discriminatory purpose. For these reasons, I dissent.

Coleman, J., dissenting.

I dissented in the panel decision, *Winfield v. Commonwealth*, 12 Va. App. 446, 404 S.E.2d 398 (1991), because the prosecutor's explanation that he peremptorily struck the jurors based on their probable level of formal education failed, in my view, to rebut the presumption of purposeful discrimination. Under the standard of appellate review that we had adopted at the time of the panel decision for determining whether a prosecutor had provided a race-neutral explanation for the peremptory strikes sufficient to rebut the presumption of purposeful discrimination, *see Jackson v. Commonwealth*, 8 Va. App. 176, 380 S.E.2d 1 (1989), the prosecutor did not provide a sufficiently credible explanation which had a basis in fact in the record to warrant the trial judge in accepting the prosecutor's explanation that race was not a basis for removing the three black female jurors. *Id.* at 453-55, 404 S.E.2d at 402-03 (Coleman, J., dissenting).

After the panel's decision, the United States Supreme Court decided *Hernandez v. New York*, 500 U.S. 352 (1991). Although the *Hernandez* holding is stated in a plurality decision, a majority of the justices concurred in the view that whether the prosecutor's intent was racially discriminatory is a factual "finding [which] will 'largely turn on evaluation of credibility' " of the prosecutor by the trial judge. *Hernandez*, 500 U.S. at 365 (quoting *Batson v. Kentucky*, 476 U.S. 79, 98 n.21 (1986)). Under the *Hernandez* holding, if the "prosecutor's explanation" is "facial[ly] valid" it "will be deemed race neutral" "[u]nless a discriminatory intent is inherent in the . . . explanation." *Id.* Because the prosecutor's intent is a factual determination based largely on credibility "[d]eference" must be accorded the trial judge's decision to believe the prosecutor. *Id.* The trial judge's decision will not be set aside except for "clear error." *Id.* Thus, the Court in *Hernandez* imposed, in my view, a much more deferential standard of federal appellate review for cases arising in the federal courts than I had thought to be required under *Batson* and a more deferential stan-

dard of review than we had adopted in the *Jackson* decision for our state review.

The majority obviously construes the *Hernandez* decision to restrict significantly the scope of appellate review and apparently chooses to adopt that standard for appellant review in the Court of Appeals. Under their reading of *Hernandez*, we must uphold the decision of the trial judge in Winfield's case because he believed that the prosecutor identified the three black women jurors before trial based solely on a correlation between their employment and education as persons he would likely exclude from the jury. Essentially, I agree with the majority that if we adopt the federal standard of appellate review enunciated in the *Hernandez* plurality, we would be required to uphold the trial judge's factual finding that the prosecutor determined to exclude before trial the three black female jurors based upon a nebulous correlation between employment and level of formal education. However, I dissent from that holding because the *Hernandez* decision does not, in my view, preclude the states from utilizing or adopting their own procedural and evidentiary rules, as a matter of state law, to decide whether the presumption of racial discrimination has been rebutted, provided that the state standard minimally safeguards the constitutional equal protection rights of defendants and jurors recognized in *Batson v. Kentucky*, 476 U.S. 79 (1986), and in *Powers v. Ohio*, 499 U.S. 400 (1991). Under the "concept of federalism" upon which the *Hernandez* plurality in large measure based its holding, 500 U.S. at 369, we may apply our established procedural and evidentiary rules in deciding whether a prosecutor has given a race-neutral explanation sufficient to overcome the presumption of purposeful racial discrimination. *See Batson*, 476 U.S. at 99 n.2. Thus, I would hold, contrary to what I believe to be the basis of the majority's decision, that the standard of review we adopted in *Jackson* is a permissible standard to determine whether a prosecutor has rebutted the presumption of purposeful discrimination, and I would hold that the *Jackson* approach should control our review of the prosecutor's action in this case. Based upon that standard, I would hold, as I said in my dissent to the panel opinion, and as Judge Benton states in his dissent, that the prosecutor failed to provide a credible race-neutral explanation for excluding the three black female jurors and that the trial judge failed to require the prosecutor to explain how and why his decision had a basis in the record. My colleague, Judge Benton

and I disagree, not upon the result that should obtain in this case by applying a *Jackson*-type analysis, but rather upon whether the *Hernandez* decision provides for a more restrictive deferential review for federal courts, which the majority is today adopting, than that previously followed in *Jackson*. Thus, although today I would join Judge Benton and reverse Winfield's conviction by applying the standard of review we adopted in *Jackson*, henceforth, based upon the principle of *stare decisis*, I will apply the *Hernandez* deferential standard that the majority adopts today.

In *Batson*, the United States Supreme Court held that the state could not, by use of a prosecutor's peremptory challenges, purposefully exclude members of a racial minority from jury participation solely on account of race. To do so violates the juror's and the accused's fourteenth amendment equal protection rights. *Powers v. Ohio*, 499 U.S. at 415. In order to establish that a prosecutor has used peremptory challenges in violation of the equal protection guarantee, the defendant bears the burden of proving purposeful discrimination by the prosecutor. *Batson*, 476 U.S. at 93. In meeting that burden, "the defendant is entitled to rely on the fact . . . that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " *Id.* at 96 (citation omitted). Although no exclusive means exists to prove that a prosecutor purposefully discriminated, a defendant may establish a *prima facie* case of discrimination by showing "that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* at 96 (citations omitted). The defendant may show that the "facts and any other relevant circumstances [which may tend to explain why the prosecutor exercised the peremptory challenges] raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* When a defendant has presented facts that give rise to the "necessary inference of purposeful discrimination" by the prosecutor, the burden shifts to the state "to come forward with a neutral explanation for challenging black jurors." *Id.* at 96-97.

As I said in my dissent to the panel's opinion, *see Winfield*, 12 Va. App. at 453-55, 404 S.E.2d at 402-03, the prosecutor failed to rebut the presumption of purposeful discrimination because, even

if he were allowed to surmise as to the probable educational level of the jurors based on their employment information, he nevertheless failed to exclude race as the reason he excluded the three black female jurors. He did not explain why, nor was he required by the judge to explain, given the fact that, based on employment information, an equal or greater number of white members of the venire probably possessed the same level of education as the stricken black members, he used all his peremptory challenges to eliminate black jurors. The paucity of the employment information and the fact that the prosecutor made no additional effort to determine the educational level, if that had been a significant factor, discredit the prosecutor's explanation that he considered or used that factor as a basis for exclusion. He asked no questions about the jurors' educational level on *voir dire* when it would have been appropriate to have done so. The employment information concerning the seven white female jurors provided the prosecutor with no basis from which he could conclude that they were any better educated than the three black females who were stricken. Nevertheless, the prosecutor was permitted, without sufficient explanation, to use all of his challenges to exclude black members from the venire. If the trial judge believed the prosecutor and accepted as true his explanation that this was, in fact, the basis for excluding the jurors, even though it may have appeared illogical, as I read the *Hernandez* decision, that would be a facially race-neutral reason and whether it was, in fact, the prosecutor's reason would be a fact that the trial judge resolved and could not be overturned on appeal because it was not "clear error." *Hernandez*, 500 U.S. at 369. "[W]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Id.*

Today, a majority of the Court adopts without serious analysis the standard of review posited by the *Hernandez* plurality. We are not required to adopt this approach and, I believe, would be better advised not to do so. Both the *Batson* and *Hernandez* decisions permit states to craft their own procedural and evidentiary rules to effectuate the protections recognized in *Batson.* The Supreme Court acknowledged that states may design their own "version[s] of the evidentiary standard," *Batson*, 476 U.S. at 99, and expressly "decline[d] . . . to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges." *Id.*; *see also Hernandez*, 500 U.S. at 369 (court

noted that to conduct a more searching review of state decisions than federal would be contrary to principles of federalism).

In the absence of an explicit mandate from the Supreme Court identifying a constitutional evidentiary standard, we have declared in Virginia that "[t]he trial judge cannot merely accept at face value the reasons proffered but must independently evaluate those reasons as he would any disputed fact." *Jackson*, 8 Va. App. at 185, 380 S.E.2d at 5. "Rubber stamp approval of all nonracial explanations will not satisfy the command of *Batson*." *Id.* (citing *Batson*, 476 U.S. at 97-98). "The record must contain findings by the trial judge, not just a conclusion, in order to facilitate both the initial inquiry and appellate review." *Id.* It would be illusory, I believe, for courts to acknowledge that a practice of discrimination is presumptively practiced in violation of the accused's and the juror's equal protection rights and then to permit the person who presumably used that discriminatory tactic to vindicate his or her action by offering a hollow, nebulous, or meaningless explanation. I believe that the trial judge condoned such a practice in this case and that the majority's decision does the same. "Trial judges must scrutinize such nebulous explanations to be satisfied that the prosecutor is not using the stated reason as a subterfuge to deny an accused a jury comprised of a racially balanced cross-section of the community." *Langhorne v. Commonwealth*, 13 Va. App. 97, 107-08, 409 S.E.2d 476, 483 (1991). Contrary to the majority's position, it was not constrained by precedent to adopt the *Hernandez* standard of review, and in my view, we should demand more in requiring a prosecutor to rebut the presumption of purposeful discrimination.

The standard of appellate review approved in *Hernandez*, and now the standard of state appellate review the majority of this Court adopts, does much to undermine a defendant's and a juror's constitutional rights not to suffer purposeful discrimination through the use of the peremptory challenge process. By imposing such procedural and evidentiary obstacles as those set forth in *Hernandez*, the Supreme Court, and now our Court, have severely curtailed and limited the beneficial impact in affording meaningful equal protection to racial minorities to participate in administering the judicial process, which the *Batson* decision was expected to accomplish. Due to the consequences which I believe that the *Hernandez* decision portends for curbing the *Batson*

equal protection rights, I agree, in principle, with much that Judge Benton has said in dissent. Nevertheless, I write separately because Judge Benton does not construe *Hernandez* as I do to limit the scope of appellate review to the extent that it does. Thus, while it is my view that the searching review suggested by Judge Benton is desirable, I cannot reconcile what he would have us do with the *Hernandez* decision, unless we are to depart from that holding on state evidentiary and procedural grounds.