Charles R. CRAIG, for himself and for all others similarly situated, Plaintiffs,

v.

ALABAMA STATE UNIVERSITY, Levi Watkins, Individually and in his official capacity as President of Alabama State University, the Board of Trustees of Alabama State University, Mrs. L. W. Noonan, Dr. R. J. McLaughlin, Mayor Andrew M. Hayden, Ross Dunn, Robert L. Potts, Lewis J. Willie, Mayor A. A. Chandler, and Robert L. Glynn, Individually and in their official capacities as Members of the Board of Trustees of Alabama State University, Tom Radney, Individually and Ed Moss, in his official capacity as a Member of the Alabama State University Board of Trustees, Defendants.

Civ. A. No. 76-21-N.

United States District Court,
M. D. Alabama, N. D.

May 1, 1978.

Howard A. Mandell and Delores R. Boyd, Mandell & Boyd, Montgomery, Ala., and Susan Williams Reeves, Birmingham, Ala., for plaintiffs.

Solomon S. Seay, Jr., Gray, Seay & Langford, Montgomery, Ala., for defendants.

MEMORANDUM OPINION

JOHNSON, Chief Judge.

In this class action, plaintiffs contend that, in its employment practices, Alabama State University ("A.S.U.") has engaged in a pattern and practice of discrimination

against whites. Specifically, plaintiffs contend, A.S.U. has discriminated against whites in the hiring of its administrative, teaching, and clerical and support staff and in the promotion and tenure of its faculty.

This action is brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985(3), and 2000e. Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343. The named plaintiff to this action is Charles R. Craig, formerly an associate professor of English at A.S.U. Defendants include Dr. Levi Watkins, President of A.S.U., the Board of Trustees of A.S.U. and its individual members, and the university itself.

The case was tried to the Court and is now submitted for decision on the issue of defendants' liability. As authorized by Rule 52(a), the Court, in this memorandum opinion, incorporates its findings of fact and its conclusions of law. Rule 52(a), Fed. R.Civ.P.[1]

▮ The controlling law in this case is not in dispute. As both plaintiffs and defendants recognize, both the Constitution and the civil rights statutes pursuant to which this suit is brought outlaw affirmative discrimination against whites as well as against members of racial minorities. *E. g., McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Detroit Police Officers Ass'n v. Young,* 446 F.Supp. 979, 1015 (E.D.Mich. 1978); *WRMA Broadcasting Co., Inc. v. Hawthorne,* 365 F.Supp. 577 (M.D.Ala.1973). The only issue presented in this case, therefore, is a factual one: whether, as alleged by plaintiffs, A.S.U. has been guilty, in its employment practices, of racial discrimination against whites.

▮ Upon the evidence presented at trial, the Court concludes that, in the hiring of its administrative, teaching, and clerical and support staff and the promotion and tenure of its faculty, A.S.U. has, as alleged by plaintiffs, engaged in a pattern and practice of discrimination against whites.

### Administrative Staff

The dispute between the parties with respect to A.S.U.'s employment of white administrators is focused on the university's post-1967 behavior. Up until 1967, A.S.U. was operated as an officially segregated state institution. *Lee v. Macon County Board of Education,* 267 F.Supp. 458 (M.D. Ala.), *aff'd mem. sub nom. Wallace v. U. S.,* 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967). As such, it employed no white professional staff. Plaintiffs contend that after A.S.U. was ordered to desegregate in 1967, *id.,* it continued to practice racial discrimination against whites in the hiring of its administrative staff. Defendants deny these charges.

The statistical evidence in this case strongly supports plaintiffs' position. In 1967, the year of the decision in *Lee,* A.S.U. employed approximately 30 administrative staff, none of whom were white. Since that time, there has been considerable turnover in A.S.U.'s staff. Also, since 1967, the ranks of A.S.U.'s administrative staff have swelled from approximately 30 to well over 50 in number. Thus, since *Lee,* there has been ample opportunity for the university to hire white administrators. Yet, in 1976, some nine years after *Lee,* of the 56 administrative staff employed by A.S.U., only four were white.

▮ "Absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial . . . composition of the population . . . from which employees are hired." *Teamsters v. U. S.,* 431 U.S. 324, 349 n. 20, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1976). In the instant case, the relevant population from which A.S.U. draws its uni-

---

1. At the time of the trial of this case, the precise contours of the plaintiff class had not yet been defined. The Court now finds that an appropriate plaintiff class in this case would include: (1) all past, present, and future white employees of A.S.U., (2) all white persons who have applied or who will apply for employment at A.S.U., and (3) all white persons who would have applied for employment at A.S.U. but for the university's discriminatory practices. An order certifying such a class in this case will be entered accordingly.

versity administrators is overwhelmingly white.[2] At trial, defendants offered no convincing proof indicating that they were unable to attract or recruit qualified white administrators to the A.S.U. campus. Thus, based on the figures cited above, the Court concludes that, since 1967, A.S.U. has engaged and continues to engage in a pattern and practice of discrimination against whites in the hiring of its administrative staff.

That A.S.U. has discriminated against whites in the hiring of its administrative staff is also reflected by the credible testimonial evidence presented at trial concerning the attempts of Dr. Paul Shafer, a white, to obtain an administrative position at A.S.U. Dr. Shafer was hired by A.S.U. as an associate professor of education in the fall of 1971. After rendering outstanding service to the university as a faculty member, he attempted to secure an administrative post at A.S.U. First, he sought to be appointed to the chairmanship of the Education Department at A.S.U. Next, he sought appointment as dean of the School of Graduate Studies. For each of these positions, he made informal applications to Dr. Levi Watkins, president of A.S.U. For each, he was recommended for appointment by his academic dean, Dr. Gordon Bliss, dean of the College of Education. Yet, despite his impressive record at the university and the recommendations of his dean, he was turned down for each position, and a black was hired in his stead.

The evidence in this case clearly demonstrates that the university's refusal to hire Dr. Shafer for an administrative post was racially motivated. When Dr. Shafer was turned down for the chairmanship of the Education Department, the evidence reflects, Dean Bliss sought out Dr. Watkins for an explanation of this action. He was told by Dr. Watkins that, though Watkins thought Shafer well-qualified for the post, there was substantial alumni and "community" opposition to hiring more whites in

administrative positions within the university. In light of this, Dr. Watkins said, he did not feel that he could appoint Dr. Shafer to chair the Education Department. Likewise, when Dr. Shafer was turned down for the deanship of the Graduate School, he, too, was told by Dr. Watkins that the university's failure to hire him in this position was due to alumni and community resistance to hiring more white administrators at A.S.U. Though Dr. Watkins denies having made such statements to either Dr. Bliss or Dr. Shafer, the Court finds his testimony on this point not to be credible.

### Faculty

The dispute between the parties with respect to A.S.U.'s employment of white faculty is, like their dispute concerning the employment of white administrators, focused on the university's post-*Lee* behavior. It is undisputed that, prior to *Lee,* the university had never employed a white faculty member. Plaintiffs contend that, since *Lee,* the university has continued to discriminate against whites in the hiring of its faculty. Further, plaintiffs contend that, since 1967, A.S.U. has been guilty of racial discrimination in the promotion and tenure of its faculty. Again, defendants deny these charges.

The statistical evidence in this case presents strong proof that, in its hiring, promotion, and tenure of faculty, A.S.U. has, since 1967, engaged in a pattern and practice of discrimination against whites. With respect to hiring, the evidence reflects that, at the time of the decision in *Lee,* A.S.U. employed approximately 95 full-time faculty members. As with its administrative staff, there has been considerable turnover among A.S.U.'s faculty since 1967. Moreover, since 1967 the size of the faculty has grown from approximately 95 to nearly 200. Yet, in 1976, of the 196 full-time faculty at A.S.U., only 36 were white. Defendants have not shown that A.S.U. has

---

**2.** Of this fact, the Court takes judicial notice. The Court also takes judicial notice of the fact that the population from which A.S.U. draws its faculty is overwhelmingly white and the fact that the population from which it draws its clerical and support workers is majority white.

been unable to recruit or attract to its campus qualified whites. Nor have they denied that the relevant "labor pool" from which the university draws its faculty is overwhelmingly white. Based on the figures noted above, the conclusion is inescapable that, since 1967, A.S.U. has discriminated against whites in its hiring of faculty. *See Teamsters v. U. S., supra,* at 340 n. 20, 97 S.Ct. 1843.

With respect to the promotion of faculty, the evidence reflects that white faculty find it much more difficult to make their way up the academic ladder at A.S.U. than do their black colleagues. Black faculty members, the evidence reflects, are able to obtain promotions in rank at the university almost as soon as they become qualified for them. White faculty members, however, once they have obtained the qualifications necessary for advancement in rank, must often wait long periods of time before being promoted. This pattern of unequal treatment, the Court concludes, clearly demonstrates that A.S.U. has, since 1967, discriminated against whites in the promotion process.

With respect to the tenure of faculty, the evidence reflects that, up until the filing of this lawsuit in 1976, white faculty have not been represented among the tenured faculty at A.S.U. in proportion to their representation among the university's faculty as a whole. In 1969, for example, while whites made up 13 percent of A.S.U.'s faculty, none of the tenured faculty at A.S.U. was white. In 1971, though whites comprised 26 percent of the faculty at A.S.U., only two percent of the tenured faculty at the university was white. In 1973, while whites comprised some 19 percent of the university's faculty, only eight percent of the tenured faculty at A.S.U. was white. Finally, in 1975, the year before this suit was brought, though 19 percent of A.S.U.'s faculty was white, only 15 percent of its tenured faculty was white. Absent explanation, the Court concludes that, in granting faculty tenure, A.S.U. has, since 1967, engaged in a pattern and practice of discrimination against whites.

That A.S.U. has practiced racial discrimination against whites in the hiring, promotion, and tenure of its faculty is also reflected by the testimony adduced at trial concerning the fate of plaintiffs' "class witnesses." Each of these witnesses was a white person and was a former or present member of the faculty of A.S.U. Each has suffered some kind of employment disappointment during his tenure at A.S.U.; i. e., his teaching contract had been non-renewed,[3] he had been passed over for promotion, or he had been denied academic tenure. It was plaintiffs' position at trial, and the testimony of each of these witnesses, that the employment disappointments which they had suffered were the product of racial discrimination on the part of A.S.U.

Without endorsing each of these witnesses' belief that he was the victim of racial discrimination, the Court does find that, taken together, the testimony concerning the fate of these class witnesses clearly demonstrates that, since 1967, A.S.U. has engaged in a pattern and practice of racial discrimination against whites in the employment of its faculty. In this regard, the Court finds the testimony concerning named plaintiff Charles Craig and class members Mrs. Ann Davidson Patillo, Drs. Paul and Carlie Shafer, and Dr. Marianne Vos to be credible and particularly compelling.

Named plaintiff Charles Craig joined the A.S.U. faculty as an associate professor of English in the fall of 1971. Dr. Craig arrived at A.S.U. with a doctorate degree in English and seven years' college teaching experience in his field. His previous employers had rated Dr. Craig as a "dependable," "competent," and "successful" teacher. In the spring of 1971, Dr. Craig's performance at A.S.U. was evaluated by his immediate academic supervisor, Dr. Ralph Bryson, then area advisor for the English Department. Dr. Bryson found him to be a competent and dedicated teacher.

---

**3.** A decision not to renew a faculty member's teaching contract is essentially a decision not to hire that faculty member for the coming academic year.

In December 1972, Dr. Craig was notified by President Watkins that his teaching contract would not be renewed for the coming academic year. At the trial of this case, Dr. Watkins was unable to offer any convincing explanation for the university's decision to non-renew Dr. Craig. Dr. Bryson testified that he, himself, had recommended that Dr. Craig be reemployed for the coming academic year and that he was "surprised" when he heard of Craig's non-renewal. This was especially so because, in making its December renewal decisions, the university had chosen to retain several black probationary faculty whose performance at. A.S.U. Dr. Bliss had rated as comparable to or less satisfactory than that of Dr. Craig. Based on the testimony above, the Court finds that Dr. Craig's non-renewal was racially motivated.

Mrs. Ann Davidson Patillo began her employment by A.S.U. in the fall of 1971 as an instructor of vocal music. She was recruited from one of the top music schools in the United States, from which she had received a masters degree. When she came to A.S.U., she had an impressive record as a national and international artist and was appointed coordinator of vocal music at the university, in which position she developed many talented student vocalists and launched the university's first operatic performance.

In the first year of her teaching at A.S.U., Mrs. Patillo was evaluated by her immediate academic superior, Dr. Otis Simmons, chairperson of A.S.U.'s Music Department. Dr. Simmons recommended her for reappointment for the 1972–73 academic term. Though she received no hint of dissatisfaction with her performance at A.S.U. after Dr. Simmons' evaluation, in December 1972, she received a notice from Dr. Watkins that her employment contract would not be renewed for the coming academic year. When Mrs. Patillo sought an explanation for this decision from Dr. Simmons, he expressed surprise at the non-renewal decision and indicated that he, himself, had recommended that she be reemployed for the coming academic year. Mrs. Patillo also sought the counsel of her academic dean, Dr. Bliss, who expressed dismay at the non-renewal decision and pledged himself to "try to do something about it." At the trial of this action, Dr. Watkins was unable to give any convincing reason for the university's decision to non-renew Mrs. Patillo. Absent any other convincing explanation and in light of the other evidence at trial, the Court finds that Mrs. Patillo's non-renewal, like Dr. Craig's, was racially motivated.

Dr. Marianne Vos joined the A.S.U. faculty in the fall of 1970 as an assistant professor of foreign languages. When she came to A.S.U., she had a doctorate in French, was trained to teach five languages, and was fluent in six others. Because of her doctorate and her four years' previous teaching experience, Dr. Vos became eligible to be promoted to the rank of associate professor at A.S.U. at the end of her first year of teaching. Yet, today, some seven years after her initial appointment, and after repeated efforts to secure a promotion in rank, Dr. Vos continues to be employed at A.S.U. as an assistant professor.

The evidence reflects that, during her tenure at A.S.U., Dr. Vos has been a veritable whirlwind of activity. She developed a French major at the university and founded the university's first French Club. She has served on numerous university committees, been active in national and international professional associations, authored numerous publications, and participated extensively in community affairs. She has received high ratings on her performance as a teacher at A.S.U. and at least one evaluation committee within the university has called her a woman with a "rare combination" of talents. During her tenure at A.S.U., she was recommended several times for promotion by her academic superiors, including Dr. Eunice Moore, dean of the College of Sciences and Humanities, and Dr. Ralph Bryson, the chairperson of its humanities division. At the trial of this case, defendants were unable to offer any convincing explanation for the university's failure to promote Dr. Vos in academic rank. Moreover, the evidence reflects that

during the time Dr. Vos was passed over for promotion, many black faculty less deserving of advancement were promoted up the academic ladder at A.S.U. In view of the above, the Court concludes that A.S.U.'s failure to promote Dr. Vos in academic rank has been racially motivated.

The Shafers joined the A.S.U. faculty in the fall of 1971. Dr. Paul Shafer was hired as an associate professor of education; Dr. Carlie Shafer, his wife, as an assistant professor of education. Each came to A.S.U. with a doctoral degree in his field. During their tenure at A.S.U., each of the Shafers voluntarily undertook, without additional remuneration, various special projects and tasks as part of the university's efforts to upgrade its College of Education. Dr. Paul Shafer, without additional pay, became the area coordinator for administration for the college, responsible for coordinating its courses and instructors. Also without additional pay, the Shafers, working as a team, designed and obtained funding for a "special education" program at the college; founded a "reading center" at the college; prepared a grant to secure federal funding for a program to offer remedial training to inadequately prepared public school teachers in the state; and designed and taught a "practicing seminar" to assist working teachers in the state in obtaining state certification.

Not surprisingly, when Dr. Bliss, dean of the College of Education, evaluated the Shafers' performance at A.S.U. in early 1972, he rated each as an "outstanding" faculty member. In late 1972, the Shafers' performance at A.S.U. was once again evaluated, this time by their department chairman, Dr. Leroy Bell. In his evaluation, Dr. Bell rated the Shafers as "above average" or "highly qualified" in nearly every aspect of their work at A.S.U. Yet, despite their impressive achievements and their excellent evaluations, the Shafers, in December 1972, were notified by Dr. Watkins that their teaching contracts with the university would not be renewed for the coming academic year.

The evidence reflects that both Dr. Bliss and Dr. Bell had recommended to Dr. Watkins that the Shafers each be reemployed for the 1973–74 academic year. At the trial of this case, Dr. Watkins was unable to offer any convincing explanation for the university's decision to non-renew the Shafers. Moreover, the evidence reflects that, at the same time it let the Shafers go, the university decided to continue the employment of another probationary teacher in the College of Education, who was black, over the contrary recommendation of Dr. Bliss. In light of the evidence outlined above, the Court finds that the Shafers' non-renewals, like those of Dr. Craig and Mrs. Patillo, were each racially motivated.

### The Role of Dr. Levi Watkins

The evidence reflects that it is Dr. Levi Watkins, President of A.S.U., who has ultimate control over employment decisions affecting the university's professional staff. It is Dr. Watkins who decides who should be hired for administrative and teaching positions at A.S.U. and which faculty at the university should be promoted or tenured. While Dr. Watkins' decisions must be approved by the Board of Trustees, the evidence reflects that such approval is given as a matter of course.

Despite his paramount role in the employment of A.S.U.'s professional staff, Dr. Watkins asserts that, if there has been any discrimination at A.S.U. in the hiring of professional and teaching staff or in the promotion and tenure of faculty, he, himself, is not to blame. In making employment decisions concerning A.S.U.'s professional staff, Dr. Watkins insists, he acts largely, if not solely, on the basis of the recommendations of his academic vice-president and his academic deans. He, himself, Dr. Watkins claims, exercises little discretion in making employment decisions concerning A.S.U.'s professional staff. Thus, he insists, if A.S.U. has discriminated against whites in the hiring of administrative and teaching staff and in the promo-

tion and tenure of faculty, it is his subordinates, and not himself, who are to blame.

Despite Dr. Watkins' protestations, the evidence in this case clearly reflects that it is he who is responsible for many, if not all, of A.S.U.'s discriminatory employment practices. The evidence reflects that, with respect to each of the individual instances of discrimination brought to the attention of the Court at the trial of this case, it was Dr. Watkins, and not some administrative subordinate, who was responsible for A.S. U.'s unlawful action. This is most clearly demonstrated in the cases of the non-renewal of the teaching contracts of Drs. Craig and Paul and Carlie Shafer and Mrs. Patillo.

At the trial of this case, Dr. Watkins insisted that, in deciding to non-renew the teaching contracts of these faculty, he relied on the recommendations of his academic vice-president, Dr. Charles Wade. The evidence reflects, however, that at the time Dr. Watkins made his decision to non-renew these faculty, he had not yet received the recommendations of Dr. Wade; indeed, Dr. Wade had not yet even begun to work on these recommendations. Rather, the evidence reflects that sometime in late November or early December Dr. Watkins called Dr. Wade into his office without warning and told him that the university needed to "get busy on the terminations that would be due December 15." Dr. Watkins then pulled out a list of the faculty members whom he wanted to receive non-renewal notices in December and read them to Dr. Wade. Drs. Craig, Paul and Carlie Shafer, and Mrs. Patillo were on that list. Then, Dr. Watkins told Dr. Wade that he should "confer with the deans and come up with these recommendations." Eventually, Dr. Wade did "come up with" recommendations for the non-renewal of Drs. Craig, Paul and Carlie Shafer, and Mrs. Patillo. However, it is abundantly clear from the evidence adduced at trial that, in deciding to non-renew these faculty, Dr. Watkins did not act on the basis of Dr. Wade's recommendations, which he, himself, had ordered to be developed. Rather, in deciding to non-renew these faculty, Dr. Watkins acted purely on the basis of his own arbitrary whim and caprice.

Such arbitrary action on the part of Dr. Watkins is not an isolated occurrence at A.S.U. The evidence reflects that Dr. Watkins runs A.S.U. like an administrative tyrant. He utilizes his powers over the employment process to maintain a nearly dictatorial grip over the internal life of the university. Any administrator or faculty member who displeases Dr. Watkins, for whatever reason, risks termination from university employment. No doubt, blacks, as well as whites, have fallen victims to Dr. Watkins' arbitrary actions. This, of course, does not detract from the Court's finding of racial discrimination in this case.

### Clerical and Support Staff

At A.S.U., decisions affecting the employment of the university's clerical and support staff are made, for the most part, in the office of its director of personnel services rather than in the office of its president.

With respect to A.S.U.'s hiring of clerical and support workers, the evidence adduced at trial focused solely on the university's post-*Lee* behavior. This evidence reflects that, at least since 1967, A.S.U. has had an extremely poor record in hiring whites to fill clerical and support positions within the university.

The labor pool from which A.S.U. draws its clerical and support staff is majority white. Yet, since 1967, only a very few of A.S.U.'s clerical and support staff have been white. In 1968, for example, of 217 clerical and support staff employed at A.S.U., only two were white. In 1972, though the number of clerical and support staff at A.S.U. had grown to 267, only four were white. And, in 1976, the year this suit was filed, of 234 clerical and support staff employed at A.S.U., only seven were white.

At trial, defendants failed to offer any convincing explanation for A.S.U.'s poor record, since 1967, in hiring whites to fill

clerical and support positions within the university. Given this failure, the conclusion is inescapable that, at least since 1967, A.S.U. has, in the hiring of its clerical and support staff, engaged in a pattern and practice of discrimination against whites. *See Teamsters v. U. S., supra,* at 340 n. 20, 97 S.Ct. 1843.

### A Final Note

A final word is appropriate. The defendants have attempted to justify their discriminatory actions in this case on the grounds that A.S.U. has been no more guilty of racial discrimination in its employment practices than have been the predominantly white state-supported universities in this state. In making this argument, defendants have marshalled statistics from eight of the eleven such schools in this state, indicating that each has made relatively slow progress over the years in achieving racial desegregation of its staff.[4]

■ It was precisely this type of argument which individual white universities used to attempt to defend themselves against desegregation efforts in the early days after *Brown v. Boards of Education.* When brought to court to answer for their discriminatory practices, these schools would argue that if other universities could discriminate, so could they. The answer to this contention is the same now as it was then. A party guilty of discrimination can receive no solace or support from the fact that others have acted contrary to law.

Finally, the Court finds that the class plaintiffs are entitled to the award of a reasonable attorneys' fee for the presentation of this litigation. The amount of the award will be determined at the conclusion of the case.

An appropriate order will be entered.

4. During 1977, the racial composition of the staffs of seven of these schools was as follows:

| School | Admin. Staff | | Faculty | | Non-Prof. Staff | |
|---|---|---|---|---|---|---|
| | Total | Black | Total | Black | Total | Black |
| Univ. of Ala. | 144 | 1 | 788 | 20 | 1,899 | 394 |
| Auburn Univ. | 180 * | 4 * | 1,120 ** | 8 | 1,998 | 673 |
| Auburn Univ. at Montg. | 14 | 1 | 223 | 6 | 122 | 37 |
| Univ. of N. Ala. | 29 | 0 | 199 | 5 | 200 | 59 |
| Univ. of Montevallo | 20 | 0 | 169 | 1 | 82 | 0 |
| Livingston University | 7 | 0 | 79 | 1 | 116 | 48 |
| Jacksonville State Univ. | 19 | 2 | 252 | 1 | 112 | 2 |

\* Estimate
\*\* Includes research and extension associates.

Defendants offered no 1976 or 1977 data concerning the racial composition of the staff of the University of Alabama in Birmingham. However, defendants' statistics do show that, in 1975, of the 977 faculty employed at the university, only 23 were black, and, of the 5,592 non-faculty staff employed at the university, 1,946 were black.