## Richmond

GEORGE FREDERICK BUCK

v.

COMMONWEALTH OF VIRGINIA

No. 0593-90-2

Decided June 22, 1993

COUNSEL

John W. Luxton (Anthony G. Spencer; Morchower, Luxton & Whaley, on brief), for respondent-appellant.

Kathleen B. Martin, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for petitioner-appellee.

## UPON REHEARING EN BANC

OPINION

BAKER, J.—George Frederick Buck (appellant) appealed from a judgment of the Circuit Court of Chesterfield County (trial court) that approved his conviction for possession of cocaine with intent to distribute. A majority of the panel that first considered this appeal reversed the judgment and remanded the case to the trial court for such further action as the Commonwealth was advised. *See Buck v. Commonwealth*, 14 Va. App. 10, 415 S.E.2d 229 (1992). We granted the Commonwealth a rehearing *en banc*.

In appellant's original petition, he presented two issues: (1) whether the trial court erred when it admitted hearsay evidence offered by a police officer; and (2) whether the prosecutor's explanation for exercising two peremptory strikes of black jurors was racially neutral. For the reasons set forth in the panel's decision, *see Buck*, 14 Va. App. at 15, 415 S.E.2d at 233, we hold that appellant is procedurally barred from raising the hearsay issue.

In this appeal, the sufficiency of the evidence to support the conviction is not an issue; therefore, we set forth only the facts relevant to the issue whether the prosecutor's explanation for exercising two peremptory strikes of black jurors was racially neutral. The entire portion of the transcript relating to the selection of the jurors is as follows:

> MS. RAND: Your Honor, may we approach the bench for one minute?

> THE COURT: Yes.

> NOTE: The following bench conference is held out of the hearing of the jury:

BENCH CONFERENCE:

> MS. RAND: I want to challenge the first strike that the Commonwealth took and ask for the Commonwealth to clarify the reason for striking Ms. Bowen.

> MR. VON SCHUCH:There were a number of reasons, Judge. The first reason was the relative youth of the juror. Compared to the rest, she's only 28, and most of the rest of them are in their thirties and forties. The second thing was that she had no children

according to the sheet.[1] Most of the other jurors do have children. I was conscious of that, because this is a case where the parents of children, particularly older children, might be more susceptible to the Commonwealth's point of view in terms of this being a drug distribution case.

Under those circumstances, I felt that she was appropriate to strike.

I would point out to the Court that there were a total of three blacks on the jury. The Commonwealth struck only two, leaving on the jury Ms. Blizzard.

MS. RAND: I didn't realize there was a third one.

What was the explanation on the other one?

THE COURT: The second strike?

MR. VON SCHUCH: Mr. Wright?

THE COURT: Yes.

MR. VON SCHUCH: Yes, sir, because he came into the court with the other jurors and appeared not to be dressed for the occasion. He came in wearing a Virginia State Varsity jacket; he has a Petersburg address. Living in that part of the county, Petersburg has a significant drug problem. Based on his appearance and the address location, I thought that he would be tolerant of this type of offense.

THE COURT: Ms. Rand?

MS. RAND: My concern was that the jurors are not representative of the population. There were three blacks on the panel. We now only have one, and I would think more significant reasons than what was given should be shown.

THE COURT: Well, the reasons are reasons for trial tactics, and the Commonwealth represents that race was not a consideration in any of the reasons that he stated and that come across to me.

---

[1] The original transcript reported that Ms. Bowen "had children" and that most of the other jurors "do not have children." This was erroneously reported and at a hearing held on October 18, 1990, the record was corrected to read as shown here.

They are legitimate reasons of trial tactics. There is basis for those, and counsel's decision to strike someone for reasons that may affect their view of the testimony, and because of that I think that I find that the Commonwealth's strikes were reasonably made and I note your exception to the Court's ruling.

■  We find that the jury selection issue in this case is controlled by our *en banc* decision in *Winfield v. Commonwealth*, 14 Va. App. 1049, 421 S.E.2d 468 (1992), which affirmed a panel holding in *Winfield v. Commonwealth*, 12 Va. App. 446, 404 S.E.2d 398 (1991). The trial court's finding on the issue of discriminatory intent is accorded great deference because the issue largely turns on evaluation of credibility. *See Hernandez v. New York*, 500 U.S. 352 (1991).

For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*

Moon, C.J.,* Coleman, J., Willis, Bray, J., and Fitzpatrick, J., concurred.

Barrow, J., dissenting.

The rule established in *Winfield v. Commonwealth*, 14 Va. App. 1049, 421 S.E.2d 468 (1992) (en banc), does not address the issue raised in this case. *Winfield*, focusing on a trial court's credibility evaluation, held only that " 'where there are two permissible views of the evidence, the fact finder's choice between them' " must be " 'accorded great deference on appeal.' " *Id.* at 1049-50, 421 S.E.2d at 468 (quoting *Hernandez v. New York*, 500 U.S. 352, 364, 369 (1991)).

"[T]wo permissible views of the evidence" do not exist in this case. The prosecutor struck a black woman because, the prosecutor said, he wanted to remove young people without children from the jury and the woman he struck was "only 28 . . . [and] had no children." He did not, however, strike another woman, of a different race, who was twenty-three years old and had no children. These facts are not in dispute.

---

*  When the case was argued, Judge Koontz presided. Judge Moon was elected Chief Judge effective May 1, 1993.

Only one permissible view of this evidence exists. The prosecutor, while saying one thing, did another. Assuming the truth of the prosecutor's explanation, we must decide whether, as a matter of law, his explanation, contradicted by his actions, rebuts the *prima facie* showing of discriminatory intent. *See United States v. Bishop*, 959 F.2d 820, 827 (9th Cir. 1992).

This question is not addressed by *Winfield*. A careful reading of the majority opinions in both the *en banc* and the panel decisions reveals absolutely no reference to this issue; only the dissents address it. *See Winfield*, 14 Va. App. at 1049, 421 S.E.2d at 468; *Winfield v. Commonwealth*, 12 Va. App. 446, 404 S.E.2d 398 (1991).

A dissent, in disagreeing with the majority, cannot define the rule of a majority decision. However tempting it may be to infer from a dissent that which is not expressed in a majority opinion, such inferential reasoning cannot be precedentially binding.

*Stare decisis* does not foreclose review of an issue not addressed on its merits in a prior decision. *Virginia Department of Corrections v. Crowley*, 227 Va. 254, 262, 316 S.E.2d 439, 443 (1984). In order to provide stability, uniformity, and predictability in the legal system, *stare decisis* assures the application of " 'principles . . . founded in the law rather than in the proclivities of individuals.' " *Payne v. Tennessee*, 501 U.S. 808, 853 (1991) (Marshall, J., dissenting) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 265 (1986)). Only a majority decision elevates a legal rule beyond the mere proclivities of an individual. *See* Ken Kimura, Note, *A Legitimacy Model for the Interpretation of Plurality Decisions*, 77 Cornell L. Rev. 1593, 1596 n.15 (1992). A dissent represents only the dissenter's view of a majority decision.

Consideration of this issue by the dissenting opinions in *Winfield* permits, at best, only the reasonable inference that the majority deliberately chose not to address the issue. A later decision of this court supports this conclusion. *See Broady v. Commonwealth*, 16 Va. App. 281, 429 S.E.2d 468 (1993). This issue has, however, been addressed by panels of our court and federal courts. Facially non-racial reasons do not overcome the *prima facie* showing of discriminatory intent when applied to members of one race and not to another. *Id.* at 285, 429 S.E.2d at 471. *See Reynolds v. Benefield*, 931 F.2d 506, 512 (8th Cir.), *cert. denied*, 501 U.S. 1204 (1991); *Walton v. Caspari*, 916 F.2d 1352, 1361-62 (8th Cir. 1990), *cert. denied*, 499 U.S. 931 (1991). *See*

*also United States v. Johnson*, 873 F.2d 1137, 1139-40 (8th Cir. 1989); *Jackson v. Commonwealth*, 8 Va. App. 176, 186-87, 380 S.E.2d 1, 6-7, *aff'd en banc*, 9 Va. App. 169, 384 S.E.2d 343 (1989). A prosecutor's disclaimer of racial discrimination is not dispositive of whether the *prima facie* showing of discrimination has been overcome. If it were, a prosecutor's denial of a discriminatory purpose would suffice. *See Batson v. Kentucky*, 476 U.S. 79, 98 (1986) (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)). Even if a prosecutor's explanation is truthful, if the criterion used by the prosecutor eliminates members of the defendant's race from the jury, but not members of another race who meet the same criterion, the explanation fails to rebut the presumption of discrimination. Consequently, in this case, the prosecutor's explanation, contradicted by his actions, does not, as a matter of law, overcome the showing of discriminatory intent.

For this reason, I would reverse the defendant's conviction and remand the matter for a new trial;[2] therefore, I dissent.

Benton, J., dissenting.

"More than a century ago [in *Strauder v. West Virginia*, 100 U.S. 303 (1879)], the [United States Supreme Court] decided that the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." *Batson v. Kentucky*, 476 U.S. 79, 85 (1986). "It is worth remembering that '[128] years after the close of the [Civil] War . . . and [113] years after *Strauder*, racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole.'" *Id.* at 106-107 (Marshall, J., concurring) (quoting *Rose v. Mitchell*, 443 U.S. 545, 558-59 (1979)). Oblivious to that history and to current reality, this Court in *Winfield v. Commonwealth*, 14 Va. App. 1049, 421 S.E.2d 468 (1992) (en banc), adopted a rule of absolute deference that shields from appellate review racially discriminatory jury selection practices. Regardless of the evidence of purposeful racial discrimination in the record and regardless of the facial invalidity of the reasons the Commonwealth offers for removing African-Americans from the jury by exercise of peremptory strikes, the majority of this Court again allows an invalid and unreasoned finding by the trial judge to shelter a pernicious practice that *Batson* sought to end. The decision renders the protections of *Batson*

---

2    Having so concluded, I need not address the consequences of the prosecutor's other peremptory strikes.

illusory and allows the shameful practice of racial discrimination in the selection of juries to continue in Virginia.

The Supreme Court has mandated that *Batson* challenges must be decided on a case-by-case basis. 476 U.S. at 96-98. Each case must be decided upon " 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' " *Batson*, 476 U.S. at 93 (quoting *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977)). The majority opinion relies solely on the reasons given by the prosecutor without any discussion of the record that conclusively demonstrated the falsity of the reasons for the strikes stated by the prosecutor. The majority simply accepts the trial judge's finding of no discrimination based upon statements made by the prosecutors that were palpably incorrect and invalid. Following the logic of *Winfield*, the majority gives absolute deference to findings of the trial judge even when, as in this case, no evidence supports the finding and, indeed, the premises upon which the finding was based have been proved false. The Court has rendered hollow the Supreme Court's pronouncement that "[t]he Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors." *Batson*, 476 U.S. at 86 (citation omitted) (footnote omitted).

The record in this case established that the prosecutor did not ask a single question of the jurors prior to exercising his peremptory challenges to strike two of the three African-Americans on the jury panel. Indeed, the prosecutor stated that "[t]he Commonwealth is satisfied with the panel," and then proceeded to remove the African-Americans from the jury. In giving account of his conduct, the prosecutor stated he struck Constance Bowen, an African-American, because of her relative youth and because she had no children. Bowen was twenty-eight years of age. The prosecutor did not strike, however, a twenty-three year old white female juror with no children. Likewise, the prosecutor did not strike a childless white male juror. The record proved that the prosecutor's stated criteria were not the reasons for the strikes and that the prosecutor engaged in unambiguous racial discrimination in applying the criteria that he asserted he used.

As overtly bigoted behavior has been universally condemned, racial exclusions continue to occur through acts more subtle. "Perhaps today [racial] discrimination takes a form more subtle than before [, but] it is

not less real or pernicious.'' *Rose v. Mitchell*, 443 U.S. 545, 559 (1979). Still, the Constitution bars ''sophisticated as well as simple-minded modes of discrimination.'' *Lane v. Wilson*, 307 U.S. 268, 275 (1939). Although the trial judge had before him the data concerning the remaining white jurors, the trial judge made no further inquiry of the prosecutor. Likewise, the trial judge did not state even in a perfunctory fashion the trial tactic that he found to be ''legitimate'' and furthered by the strike. The majority does not disclose what salient facts lead it to conclude that the trial judge's finding is supported by some basis in the record.

The prosecutor stated he struck Richard T. Wright because (1) Wright was wearing a Virginia State University varsity jacket that the prosecutor believed was not appropriate dress in which to serve on a jury, and (2) Wright had a Petersburg mailing address, which, the prosecutor said, suggested that Wright lived near a city with ''a significant drug problem'' and, thus, would be tolerant of narcotic use. However, the prosecutor provided no explanation why he considered it objectionable for a prospective juror to wear a jacket bearing the logo of Virginia State University, a predominately African-American university located in Chesterfield County. *See Norris v. State Council of Higher Educ.*, 327 F. Supp. 1368, 1370 (E.D. Va.), *aff'd sub nom. Board of Visitors of the College of William & Mary v. Norris*, 404 U.S. 907 (1971). Obviously, a jacket is not an unusual choice of clothing for a juror to wear in December. The only rational explanation apparent on the record is that the prosecutor objected to Wright's perceived affiliation with a university that was historically conceived, operated, and maintained by State law for African-Americans. *See Norris*, 327 F. Supp. at 1370.

The prosecutor's objection to Wright's residence also demonstrates racial discrimination. First, the prosecutor's assertion that Wright was objectionable as a juror because he lived in the area of Chesterfield County that was near the City of Petersburg simply lacks facial validity. The record proved that the prosecutor's statement concerning Wright's address was incorrect. The list of jury panel members shows that Wright has a Richmond mailing address, not a Petersburg mailing address, as stated by the prosecutor. Had the trial judge but looked at the list he would have been aware that the prosecutor's stated reason was invalid.

Moreover, even if Wright had a Petersburg mailing address, the prosecutor provided neither a rational nor non-racial explanation for

his assertion that a person who lives in southern Chesterfield County and receives mail delivery through the Petersburg post office is tolerant of narcotic use. All of the jurors lived in Chesterfield County, the jurisdiction where the trial was held. The prosecutor's suggestion to the trial judge that he struck Wright because he believed that Wright's mailing address indicated Wright "would be tolerant" of narcotic use reeks of race prejudice. The prosecutor made that assumption because Wright's postal delivery designation placed Wright in the area of the County near a city that has a large African-American population.[3]

The history of race discrimination in the United States is replete with examples of devices used to mark people of color with the badge of slavery. Stereotypes have long been the vehicle by which discrimination is conveyed.

> Residence, as it were, often acts as an ethnic badge. As study after study has showed, residence, especially in urban centers, can be the most accurate predictor of race - more accurate, indeed, than social class. *See, e.g.*, Kain, *The Influence of Race and Income on Racial Segregation and Housing Policy*, in Housing Desegregation and Federal Policy 99, 102 (1986); Note - *Racial Diversity in Residential Communities: Societal Housing Patterns and a Proposal for a "Racial Inclusionary Ordinance"*, 63 S. Cal. L. Rev. 1151, 1167-69 (1990). As one commentator remarked, "[O]ne legacy of the [racial] caste system has remained largely intact: the urban ghetto." Comment - *Individual Rights and Demographic Realities: The Problem of Fair Housing*, 82 N.W.L. Rev. 874, 875 (1988).

*United States v. Bishop*, 959 F.2d 820, 828 (9th Cir. 1992). The purposeful exclusion of African-Americans from juries by the use of residential stereotypes is neither unique nor less pernicious than overt forms of discrimination. "[W]here residence is utilized as a surrogate for racial stereotypes — as, for instance, a short hand for insensitivity to violence — its invocation runs afoul of the guarantees of equal protection." *Bishop*, 959 F.2d at 826.

The reason given by the prosecutor, that an African-American who lived near (not in, but near) a city with a "drug problem" would be sympathetic to narcotic use, is both irrational and a convenient means by which to mask racial bias. It is simply irrational to suggest that a

---

[3] *1990 U.S. Census Population by Race*, U.S. Dept. of Commerce, Census Bureau.

person is tolerant of narcotic use simply because that person is "[l]iving in [a] part of the county" that is near a city with a "drug problem."

> Ultimately, the invocation of residence both reflected and conveyed deeply ingrained and pernicious stereotypes. Government acts based on such prejudice and stereotypical thinking are precisely the type of acts prohibited by the equal protection clause of the Constitution.

*Bishop*, 959 F.2d at 825-26 (citations omitted). "Where the prosecutor's . . . explanation is an obvious mask for a race-based challenge, the prosecutor has not met his burden under *Batson.*" *Splunge v. Clark*, 960 F.2d 705, 709 (7th Cir. 1992). The record established that Wright is forty-six years of age, has sixteen years of education, and has two children ages eleven and twelve. Based on the prosecutor's asserted, albeit incorrect, explanation for striking Bowen (that she was young and childless), Wright logically should have been a desirable jury member.

The prosecutor's assumption that Wright and Bowen would be tolerant of drug use was no more than a "surrogate for racial stereotypes." *Bishop*, 959 F.2d at 826. The trial judge said that the prosecutor's decision was prompted by "reasons that may affect [those person's] view[s] of the testimony."

> But the role of the trial judge in assessing the prosecutor's motive only kicks in once a race-neutral justification has been offered. Here, . . . the justification was tainted by impermissible generalizations regarding racial groups and their environment. The trial judge's credibility determinations therefore are not in question. We need not reach the issue whether the prosecutor's explanation was honest or merely a sham; rather, we conclude that, even assuming it was sincere, the government's explanation is not sufficient to satisfy *Batson* because "a discriminatory intent is inherent in the prosecutor's explanation."

*Id.* at 827.

The strikes used to exclude African-Americans from the jury were based on premises proved to be invalid and, moreover, upon premises applied to African-Americans but not to the white members of the panel. The only tactic that is obvious from the strike and the reason advanced by the prosecutor is one that is condemned by *Batson.*

"[T]he prosecutor may not . . . challenge[ ] jurors of the defendant's race on the assumption — or his intuitive judgment — that they would be partial to the defendant because of their shared race." *Batson*, 476 U.S. at 97. *Batson* is clear in its command that the prosecutor does not meet his burden "merely by denying that he had a discriminatory motive or "affirm[ing] [his] good faith in making individual selections." 476 U.S. at 98 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)).

By accepting as dispositive a finding by the trial judge that has no basis in fact or in the record, this Court, as it did in *Winfield*, has allowed the prosecutor to avoid the mandate of *Batson* by the use of a "discriminatory racial proxy." *Bishop*, 959 F.2d at 826. This Court again sends the message that in Virginia any reason will suffice to remove African-Americans from juries so long as the prosecutor does not admit on the record race as the reason and the trial judge blindly accepts the prosecutor's assertion that race was not the reason. That message contravenes the principle that "[i]n our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption . . . that justice in a court of law may turn upon the pigmentation of skin [or] the accident of birth . . . ." *Ristaino v. Ross*, 424 U.S. 589, 596 n.8 (1976).

"The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered." *Duncan v. Louisiana*, 391 U.S. 145, 155 (1968).

> When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.

*Peters v. Kiff*, 407 U.S. 493, 503-04 (1972) (footnote omitted). "It would seem equally self-evident that the appearance of discrimination in court procedure is especially reprehensible, since it is the complete antithesis of the court's reason for being — to insure equality of treatment and evenhanded justice." *State v. Slappy*, 522 So. 2d 18, 20 (Fla.) *cert. denied*, 487 U.S. 1219 (1988). "Discrimination within the

judicial system is [the] most pernicious.'' *Batson*, 476 U.S. at 88. ''[B]y giving official sanction to irrational prejudice, courtroom bias only enflames bigotry in the society at large.'' *Slappy*, 522 So. 2d at 21.

''In view of the heterogeneous population of our Nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race.'' *Batson*, 476 U.S. at 99. This decision not only has deprived Buck of a right to a fair trial but has also inflicted harm upon the excluded jurors, Bowen and Wright.

> Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial. A person's race simply ''is unrelated to his fitness as a juror.'' As long ago as *Strauder*, therefore, the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror.

*Batson*, 476 U.S. at 87 (citations omitted). The exclusion of Bowen and Wright from the jury ''is practically a brand upon them, affixed by the law, and assertion of their inferiority.'' *Strauder*, 100 U.S. at 308.

Moreover, the Supreme Court has recognized the great societal harm that results from this practice.

> The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. Discrimination within the judicial system is most pernicious because it is ''a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others.''

*Batson*, 476 U.S. 87-88 (quoting *Strauder*, 100 U.S. at 308).

Because the underlying explanations offered for striking the two African-American jurors find no legitimate support in the record and,

indeed, are contrary to the facts, the trial judge erred in finding that the prosecutor's explanations were not racially based. For the reasons I have stated here, and for the reasons stated in my dissent to *Winfield*, 14 Va. App. at 1050-62, 421 S.E.2d at 469-76, I would reverse the conviction and remand for a new trial.

I dissent.

Koontz, J., dissenting.

I respectfully dissent from the majority's conclusion that this appeal is controlled by our *en banc* decision in *Winfield v. Commonwealth*, 14 Va. App. 1049, 421 S.E.2d 468 (1992). On the facts of the present case, in my view, a discriminatory intent is inherent in the prosecutor's explanations for striking the two African-American jurors in question. As such, these explanations do not rebut the *prima facie* showing of discriminatory intent in striking these jurors.

I can discern no valid non-racial basis to strike an African-American woman who is twenty-eight years old and has no children while not striking a woman of another race who is twenty-three years old and has no children. Similarly, I can discern no valid non-racial objection to an African-American juror wearing a Virginia State Varsity jacket to a court proceeding. Although the prosecutor may have had a non-racial explanation for striking these jurors, he provided none. Moreover, the trial judge required none from him. Under such circumstances, neither the prosecutor's sincerity nor the trial judge's credibility determination are matters of our concern in this appeal. In short, *Winfield* does not address the issue presented by this appeal.

The condemnation of racial discrimination in the jury selection process is not a matter in dispute by the judges of this Court in this or our prior cases. We are in total agreement in the absoluteness of that condemnation. The struggle, evident from the separate scholarly dissenting opinions written by Judges Benton, Barrow and Elder, is not, and need not be, to ensure the viability of that condemnation. Rather, we struggle to find an appropriate balance between the protection of the constitutional rights of members of an identifiable racial segment of our heterogeneous society in the jury selection process and a standard of appellate review that does not sacrifice the stability of the judicial system that is fostered, in large part, by according great deference to the findings of fact and credibility determinations made by the trial court.

I make no attempt here to articulate how that balance is to be achieved in every case. I write separately only to emphasize that a challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), requires a *meaningful* review by the trial court of the explanations given by the prosecutor when protected members of the accused's race are excluded from jury service in a particular case. Where the record does not support the conclusion that a meaningful review of the prosecutor's explanation was conducted by the trial court, the *prima facie* showing of racial discrimination in the jury selection process mandates a reversal and remand for a new trial. At a minimum, a meaningful review requires that the explanation given by the prosecutor for finding a member of one race objectionable is equally applied to a member of another race.

In the present case, the record does not support a conclusion that the trial court conducted a meaningful review of the accused's *Batson* claim. Accordingly, I would reverse the conviction and remand for a new trial.

Elder, J., dissenting.

The majority finds that the Supreme Court's holding in *Hernandez v. New York*, 500 U.S. 352 (1991), and this Court's holding in *Winfield v. Commonwealth*, 14 Va. App. 1049, 421 S.E.2d 468 (1992) (en banc), require that we affirm the judgment of the trial court. As one of the six members of this Court forming the majority in *Winfield*, and one of three panel members in two unanimous cases in which we have further refined *Winfield*, *Broady v. Commonwealth*, 16 Va. App. 281, 429 S.E.2d 468 (1993), and *Carter v. Commonwealth*, 16 Va. App. 118, 428 S.E.2d 34 (1993), I disagree.

## I.

The holding in *Batson v. Kentucky*, 476 U.S. 79 (1986), requires a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violative of the Equal Protection Clause:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for

striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez*, 500 U.S. at 358-59 (citations omitted). It is clear that " '[t]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal.' " *Winfield*, 14 Va. App. at 1049, 421 S.E.2d at 469 (quoting *Hernandez*, 500 U.S. at 364). Furthermore, we will not overturn that finding " 'unless . . . its determination was clearly erroneous.' " *Winfield*, 14 Va. App. at 1050, 421 S.E.2d at 469 (quoting *Hernandez*, 500 U.S. at 369).

The question is "[u]nder what circumstances does such a criterion [one closely tied to race] cease being race-neutral and become a surrogate for impermissible racial biases." *United States v. Bishop*, 959 F.2d 820, 823 (9th Cir. 1992). The language of *Batson* makes clear that peremptory strike cases are to be decided on the particular facts of each case. 476 U.S. at 96-98. The majority in this case fails to note the significant factual distinctions between this case and *Winfield* and *Hernandez*. In both *Winfield* and *Hernandez*, the prosecutors' explanations were found to be race-neutral. Here, I would conclude that the prosecutor's reasons clearly ceased to be race-neutral and became "a surrogate for impermissible racial biases."

A. *Race Neutrality in Winfield, Hernandez and Broady*

In *Winfield*, the prosecutor struck one African-American woman because she admitted that she knew the defendant. The other three peremptory strikes of African-American women were based on the prosecutor's decision made the previous night when he reviewed the venire list "before he had any knowledge of their race." *Winfield v. Commonwealth*, 12 Va. 446, 448, 404 S.E.2d 398-99 (1991). These facts are similar to those in *Hernandez*, where the prosecutor "did not know which jurors were Latinos." 500 U.S. at 369-70. The prosecutor in *Winfield* further explained that he made his decisions based on the listed occupations of these persons, which he thought indicated a limited level of education. 12 Va. App. at 452, 404 S.E.2d at 402. Whether the prosecutor's correlation of employment and education was accurate or a legitimate basis for selecting a jury was not the issue. Clearly, obtaining a well-educated jury is a permissible goal and one that is facially race-neutral. In *Winfield*, all of the prosecutor's stated reasons for making the peremptory strikes were facially race-

neutral representations. In *Winfield*, defense counsel did not make any representations or offer any evidence to rebut the prosecutor's articulated facially race-neutral representations. The trial judge found the prosecutor's explanation credible in *Winfield*, and under the facts of that case, we found no legal basis upon which to overturn that finding on appeal.

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. . . . [E]valuation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez*, 500 U.S. at 365 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).

In *Broady v. Commonwealth*, 16 Va. App. 281, 429 S.E.2d 468 (1993), the defense attorney called the trial court's attention to the fact that the articulated facially race-neutral reason for peremptory strikes was being applied exclusively to African-Americans. There, we said that "after the Commonwealth has asserted a facially race-neutral reason to strike but has only struck jurors of one race and the reason asserted for the strike is equally applicable to other members of the venire of a different race, the reason asserted is not a satisfactory race-neutral explanation for the Commonwealth's strikes." *Id.* at 285, 429 S.E.2d at 471. "[W]hen it is further demonstrated that facially nonracial reasons are applied systematically to blacks but not whites, the Commonwealth has not overcome the presumption that the strikes were racially motivated." *Id.* (citing *Reynolds v. Benefield*, 931 F.2d 506 (8th Cir. 1991)).

B. *Race Neutrality and Judicial Notice in Buck*

I agree with the majority that, based on the defense attorney's failure to clearly establish on the record any pretextual basis for the strike of the African-American woman, the trial judge's finding that the strike of that venireman was race-neutral is supported by credible evidence. However, the prosecutor's articulated reasons for striking the African-American male raise other issues that should be reviewed by this Court. The prosecutor explained his reason for that strike as follows:

Yes, sir, because he came into the court with the other jurors and appeared not to be dressed for the occasion. He came in wearing a Virginia State Varsity jacket; he has a Petersburg address.[4] Living in that part of the county, Petersburg has a significant drug problem. Based on his appearance and the address location, I thought he would be tolerant of this kind of offense.

The mention of the Virginia State varsity jacket clearly refers to the venireman's connection to a university whose student body is predominately African-American. *See Norris v. State Council of Higher Educ.*, 327 F. Supp. 1368, 1370 (E.D. Va.), *aff'd sub nom. Board of Visitors of the College of William & Mary v. Norris*, 404 U.S. 907 (1971). It is clear from the context of the prosecutor's statement that he was not referring merely to the fact that this venireman was wearing a varsity jacket, as opposed to other apparel that the prosecutor may have deemed more appropriate for the occasion. If that were the case, there would have been no need to refer to Virginia State University. The further reference (although incorrect) to the venireman's address as Petersburg as a reason to believe that he would be tolerant of "this kind of offense" must be viewed in light of the fact that the population of the City of Petersburg is more than seventy percent African-American. *1990 U.S. Census Population by Race*, U.S. Department of Commerce, Census Bureau.

Although the racial composition of Virginia State University and the City of Petersburg was not brought out by defense counsel and is not otherwise reflected in the record, it is manifestly appropriate for trial and appellate courts to take judicial notice of such matters. Although it is trial courts that ordinarily take judicial notice of matters, the Virginia Supreme Court has regularly taken judicial notice of "whatever ought to be generally known within the limits of [its] jurisdiction." *Vaughan v. Town of Galax*, 173 Va. 335, 342-43, 4 S.E.2d 386, 389 (1939) (quoting *Redd v. Supervisors of Henry County*, 72 Va. (31 Gratt.) 695, 709 (1879)); *see also Baldwin v. Commonwealth*, 203 Va. 570, 572, 125 S.E.2d 858, 860 (1962) ("[T]he trial court could, and this court will, properly take judicial notice of the fact that the city of Norfolk is in this Commonwealth"); *West Bros. Brick Co. v. City of Alexandria*, 169 Va. 271, 281, 192 S.E. 881, 885 (1937) (Courts take cognizance of public and social developments); *Omohundro v. Palmer*, 158 Va. 693, 697, 164 S.E. 541, 543 (1932) (taking judicial

---

[4] The venire listing actually shows the address to be Richmond.

notice of the fact that the distance between Louisa Court House and Goochland County is relatively short). Appellate and trial courts routinely take judicial notice of census figures to determine the racial make-up of various populations. *See Craig v. Alabama State Univ.*, 451 F. Supp. 1207, 1208-09 (M.D. Ala. 1978), *aff'd*, 614 F.2d 1295 (5th Cir.), *cert. denied*, 449 U.S. 862 (1980); *Goins v. Allgood*, 391 F.2d 692, 697 (5th Cir. 1968); *Bradley v. School Bd. of Richmond*, 317 F. Supp. 555, 566 (E.D. Va. 1970); *Sims v. Baggett*, 247 F. Supp. 96, 108 (M.D. Ala. 1965).

Even aside from the clear legal precedent, to contend that "it is not generally known within the limits of Chesterfield County" that the populations of Virginia State University and the City of Petersburg are predominantly African-American is to ignore reality. An appellate court cannot ignore what it "ought to know," nor can we allow a trial court to do so.

The trial judge found that the peremptory strikes were made "for reasons for trial tactics," that "race was not a consideration," and that the strikes were "reasonably made." However, as the Court of Appeals for the Ninth Circuit emphasized in *United States v. Bishop*,

> the role of the trial judge in assessing the prosecutor's motive only kicks in once a race-neutral justification has been offered. Here, as we have explained, the justification was tainted by impermissible generalizations regarding racial groups and their environment. The trial judge's credibility determinations therefore are not in question. We need not reach the issue whether the prosecutor's explanation was honest or merely a sham; rather, we conclude that, even assuming it was sincere, the government's explanation is not sufficient to satisfy *Batson* because "a discriminatory intent is inherent in the prosecutor's explanation."

959 F.2d 820, 827 (9th Cir. 1992) (quoting *Hernandez*, 500 U.S. at 360) (other citations omitted). The Ninth Circuit's reasoning in *Bishop* is persuasive as applied to this case.

C. *The Majority's Misapplication of Hernandez*

The majority's reliance on *Hernandez* appears to be misplaced due to the significant distinctions between the two cases. In *Hernandez*,

> [t]he prosecutor . . . offered a race-neutral basis for these peremptory strikes. As explained by the prosecutor, the challenges rested

neither on the intention to exclude Latinos or bilingual jurors. . . . The prosecutor's articulated basis for these challenges divided potential jurors into two classes: those whose conduct during *voir dire* would persuade him they might have difficulty in accepting the translator's rendition of Spanish-language testimony and those potential jurors who gave no such reason for doubt.

*Hernandez*, 500 U.S. at 353. In *Hernandez*, the prosecutor gave a facially valid explanation as to why what appeared to have been a race or ethnic based reason — language — was race-neutral in its application. No such explanation was offered by the prosecutor in the case before this Court. In contrast, the stated reasons in this case — that the venireman was affiliated with Virginia State University and had a Petersburg address — are generic reasons with no nexus to this specific trial. If the prosecutor had shown that, by virtue of the prospective juror's address and affiliation with Virginia State University, he had some particular knowledge or bias about this case, *i.e.*, that he lived next door to a known drug dealer whose primary market was Virginia State University, what is facially a race-based reason would become acceptable as a race-neutral basis for making the peremptory strike. This is exactly what occurred in *Hernandez*.

Furthermore, the Supreme Court suggested in *Hernandez*, as it did in *Batson*, that there is no all-encompassing rule to employ in deciding these cases, but that each case must be judged on its particular facts. The Court said:

In holding that a race-neutral reason for a peremptory challenge means a reason other than race, we do not resolve the more difficult question of the breadth with which the concept of race should be defined for equal protection purposes. We would face a quite different case if the prosecutor had justified his peremptory challenges with the explanation that he did not want Spanish-speaking jurors. It may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis.

*Hernandez*, 500 U.S. at 371.

[W]here residence is utilized as a surrogate for racial stereotypes — as, for instance, a shorthand for insensitivity to violence [in this case drug-related crimes] — its invocation runs afoul of the

guarantees of equal protection. The difference between *Hernandez* [and *Winfield*] on the one hand, and the present case on the other, is the difference between a reason — whether valid or not — and a racial stereotype. . . . It is, in short, the difference between what the Constitution permits and what it does not.

*Bishop*, 959 F.2d at 826.

In this case, the prosecutor made no attempt to connect the prospective juror's residence to the facts of the case. The strike was simply applied to an African-American man who was affiliated with an African-American university and whose address was allegedly in proximity to a predominantly African-American city. Because of these facts and the alleged "drug problem" the prosecutor associated with the City of Petersburg, the trial judge found the strike permissible. Unfortunately, "African-Americans, their neighborhoods, crime and violence all become amalgamated, giving rise to tenacious stereotypes — innocent and unintentional perhaps, but stereotypes nonetheless. They are and must remain unwelcome in the courtroom." *Id.* at 828. I reiterate that my position does not mean that an African-American associated with an African-American institution and living in a predominantly African-American neighborhood can never be peremptorily struck in the trial of an African-American. Quite simply, it means that in order to justify such a strike under *Batson* and *Hernandez*, there must be a specific showing of the relevance of those facts in the particular case being tried.

## II.

In summary, the distinctions between *Winfield* and *Hernandez* and the present case are clear. In *Winfield*, the prosecutor based his strikes on what he perceived to be the educational level of the potential jurors and made that decision *before* he knew the race of the individuals. Defense counsel in *Winfield* made no attempt to establish that the reasons given were a pretext for a racially motivated strike. The trial judge found the prosecutor's explanation credible, and nothing in the record indicated that this explanation was inherently incredible. Consequently, this Court affirmed the trial court in accordance with the long-established standard of review and the holdings of *Batson* and *Hernandez*. In *Hernandez*, the Supreme Court upheld the trial judge's credibility finding regarding the peremptory strikes on what appeared to have been a race-based reason, because the prosecutor supported his

statements by questions during *voir dire*. These questions clearly established that, although his approach may have had a racial (ethnic) appearance, his rationale for strikes applied equally to Latinos and non-Latinos. In the case before us, by contrast, the prosecutor's explanation for striking the male African-American venireman was that he was wearing a jacket indicating an affiliation with a predominantly African-American university and allegedly had an address in close proximity to a predominantly African-American city. Thus, no race-neutral reason was advanced for the strike of this venireman. Consequently, this case must be reversed and remanded.

My decision in this case in no way conflicts with the general principle enunciated in *Winfield*, *i.e.*, that deference must be given to the trial judge's finding regarding the credibility of the prosecutor's stated race-neutral reason for striking a potential juror. We have never said that we will defer to the trial judge's findings without meaningful appellate review. Perhaps in *Winfield* we should have drawn the distinction I have made in this opinion. However, in view of the fact that the defense attorney in that case did not challenge the prosecutor's facially race-neutral reasons and that the trial judge chose to believe the prosecutor, we did not find it necessary to do so. Nevertheless, we have since refined and explained the proper application of *Winfield* in *Carter* and *Broady*, both of which support the approach taken in this dissent.

For the foregoing reasons, I would reverse and remand for a new trial if the Commonwealth be so advised.